Steve Steele **SHIPLEY**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 05–86–00558–CR.

Court of Appeals of Texas, Dallas.

March 17, 1987.

Molly Meredith Lenoir, Dallas, for appellant.

Kathi Alyce Drew, Dallas, for appellee.

Before WHITHAM, BAKER and LAGARDE, JJ.

LAGARDE, Justice.

Steve Steele Shipley was convicted by a jury of murder. Punishment was assessed by the same jury at life imprisonment. In four points of error, appellant contends that: (1) the trial court abused its discretion by restricting the appellant's voir dire examination; (2) the evidence is insufficient to support the conviction; (3) the trial court erred in failing to instruct the jury on the lesser-included offense of attempted murder; and (4) the instructions to the jury regarding the law of parole violated the constitutional provisions guaranteeing the separation of governmental powers and deprived him of a fair trial as guaranteed by the due process clauses of the federal and state constitutions. For the reasons stated below, we overrule these points and affirm.

Appellant contends that the trial court abused its discretion by disallowing appellant the opportunity to question the jury panel on their opinions about extramarital affairs, thereby denying appellant his right to counsel to intelligently exercise his peremptory challenges.

■ The record reflects that the following occurred during voir dire examination:

DEFENSE COUNSEL: I don't think this is really going to be an issue in the case, but it is the kind of thing that does come up from time to time in a criminal case and that's the reason I ask it.

I need to talk with you about something that is very hard for me to talk with you about because it is hard for me to bring the subject up in a group this large, but I do need to bring it up, and that is the subject of an extramarital affair, where a husband or wife is seeing somebody else in the same sex outside the marriage. (sic)

It's reasonable to me that to believe there are several of you on the panel who have encountered situations like this in life or in some way related. I mean, you know about, or you have seen, or hate to see involved, but it's my duty to bring this up.

Doctor Unger, how would you feel about it if it became apparent—

THE STATE: I will object to this, going into any possible facts of this case.

DEFENSE COUNSEL: I'm not going into the facts of this case, Your Honor. I am talking about extramarital affairs in general, not going into the facts of this case. I realize I am well prohibited from doing that. It's often asked if a witness can base the testimony on one

witness. I mean, you know, that may be the facts of that case, but as a general matter, inquiry is permitted.

THE COURT: Well, you are going to have to be more specific in your question. Otherwise, I am not going to be able to say that you are not talking about this case when you say, "How do you feel about that?" You are going to have to be specific, then I am going to rule. I will let you ask that question.

DEFENSE COUNSEL: I want to make it clear, Your Honor, that I am not making inquiries with relationship to this case. I am talking about the subject of extramarital affairs.

THE COURT: Well, what I am talking about the question to the Doctor, I am going to sustain the objection if that is the way you're going to phrase that.

DEFENSE COUNSEL: I will rephrase that question.

THE COURT: All right. I sustain the objection at this time.

DEFENSE COUNSEL: All right. Thank you, Your Honor. Have you ever known somebody that was harmed by extramarital affairs?

THE STATE: I am going to object to that. I mean, I don't see what possible inquiry that has anything to do with— one, it doesn't have anything to do with this case. It's irrelevant to anything. Two, if it has something to do with the case, it's going into specific facts of the case, and I object to it.

DEFENSE COUNSEL: Now, Your Honor, I am—pardon me for interrupting. Go ahead.

THE STATE: No, I am finished.

THE COURT: Go ahead.

DEFENSE COUNSEL: Your Honor, I am not asking the question with reference to this case. I am simply asking about life experiences. I am certainly entitled to information like that to be exercised peremptory challenges, and the State has reasonable latitude to do the same thing and has in this case.

THE COURT: Sustained.

DEFENSE COUNSEL: Your Honor, are you going to forbid me asking that ques-

tion of every member of the voir dire panel?

THE COURT: Yes.

The constitutional rights to counsel and trial by jury carry with them the right of counsel to interrogate members of the jury panel for the purpose of enabling counsel to exercise intelligently his peremptory challenges. *Esquivel v. State*, 595 S.W.2d 516, 524 (Tex.Crim.App.1980), *cert. denied*, 449 U.S. 986, 101 S.Ct. 408, 66 L.Ed.2d 251 (1980); *Williams v. State*, 629 S.W.2d 791, 794 (Tex.App.—Dallas 1981, pet. ref'd). However, the conduct of voir dire examination rests within the sound discretion of the trial court, and only an abuse of discretion will call for reversal. *Clark v. State*, 608 S.W.2d 667, 670 (Tex.Crim.App.1980).

■ The record reflects that the trial court only disallowed the question as asked, to-wit: "Have you ever known somebody that was harmed by extramarital affairs?" It does not reflect that the trial court disallowed any inquiry into any preconceptions, bias or prejudice of the prospective juror. The question, as phrased, was not focused toward credibility of witnesses, an area of law, a theory of punishment, or a preconceived notion tending to reflect bias or prejudice, all of which are proper inquiries on voir dire examination. *See Florio v. State*, 568 S.W.2d 132, 133 (Tex.Crim.App.1978); *Hernandez v. State*, 508 S.W.2d 853, 854 (Tex.Crim.App.1974) (credibility of witnesses); *Campbell v. State*, 667 S.W.2d 221, 223 (Tex.App.—Dallas 1983), *aff'd*, 685 S.W.2d 23 (Tex.Crim. App.1985) (theories of punishment). The question, as asked, reflects no inherent relevance as to the prospective juror's preconceived feelings, bias or prejudice against persons who might engage in extramarital affairs, but simply asked whether or not the prospective juror had ever known somebody who was harmed by an extramarital affair. It is possible, of course, to have known someone who was harmed by an extramarital affair and yet not be prejudiced or biased; on the other hand, it is also possible to be prejudiced against those who would engage in extramarital affairs while never having personally known any-

one who was harmed by an extramarital affair.

■ Although appellant argues that the court disallowed any inquiry into the subject, we do not read the court's ruling so broadly. The record reflects simply that the court disallowed "that question" being asked of Dr. Unger as well as all other members of the voir dire panel. The question, as asked, was also improper because it went to a peculiar fact of the case, i.e., the anticipation of evidence of an extramarital affair. It is settled Texas law that it is not error for the trial court to refuse to allow questions based on facts "peculiar to the case at trial." *White v. State,* 629 S.W.2d 701, 706 (Tex.Crim.App.1981), *cert. denied,* 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457 (1982); *Brown v. State,* 674 S.W.2d 443, 446 (Tex.App.—Dallas 1984, pet. granted). Counsel was given an opportunity to rephrase his question in order to properly elicit relevant facts from which he could intelligently exercise his strikes; however, he failed to do so. Inasmuch as the question, as asked, was not a proper question, the trial court did not abuse its discretion by disallowing the question. No error has been shown.

Appellant next challenges the sufficiency of the evidence to show that he actually shot his wife, Deborah Sue Shipley, and that such gunshot caused her death.

There were no eyewitnesses to the shooting of Deborah Sue Shipley, nor did appellant confess to the commission of the offense. This is, therefore, a circumstantial evidence case. Every circumstantial evidence case must, of necessity, be tested by its own facts to determine the sufficiency of the evidence. *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Crim.App.1977). The facts pertinent to appellant's sufficiency point show the following:

It is undisputed that Deborah Sue Shipley, appellant's wife, while lying in bed under "neatly placed" bedcovers in the bedroom of her home, was shot in the head on April 24, 1985, at some time shortly before 5:30 a.m.

There was no evidence of a struggle at the residence, nor did the house appear to have been ransacked. There was no evidence of a forced entry on April 24, 1985, although there was evidence of a forced entry on April 24, 1985, although there was evidence from interested family members that they observed signs of forced entry on the front door subsequent to April 24, 1985.

On April 7, 1985 (Easter Sunday), appellant told the mother of Lisa Harper, a woman with whom he was having an affair, that he and Lisa were going to get married. He also told Lisa Harper that "he would have some kind of an inheritance" and that "he was going to buy a house" and also that "he was going to buy (Lisa) a car." In April 1985, appellant bought Lisa Harper a wedding ring and they set a wedding date for a "big wedding." In conversations with Lisa Harper, appellant, in referring to his wife, would "say that she was a bitch and that she didn't like the way he was doing Meagan (their sixteen-month-old daughter)."

On April 8, 1985, appellant purchased a .22 caliber pistol. The box to the .22 caliber pistol was found in appellant's garage. The receipt inside the box was dated April 8, 1985. Also, on April 8, 1985, appellant applied for a life insurance policy on Deborah Sue Shipley in the amount of $200,000. Appellant was the named beneficiary. In May of 1985 appellant told Lisa Harper that "if they ever came to call on (her), to leave town."

Virginia Coleman, another woman with whom appellant had an affair, testified to schemes and plans that appellant had come up with to "get Meagan from Deborah Sue." Appellant sought the participation of Coleman in various schemes to lead Deborah Sue Shipley into certain suggestive poses while the appellant photographed them in an attempt to manufacture evidence to show that Deborah Sue Shipley was an unfit mother. Coleman refused to participate in such schemes and her relationship with appellant ended shortly after such refusal.

Stephanie Luedke, appellant's next-door neighbor, who had known appellant for about one year, testified that appellant did

not live at home with his wife during January and February of 1985, but that he moved back in on March 1, 1985. She further testified that at about 5:30 a.m. on April 24, 1985, her doorbell rang. She went to the door and looked out. Appellant, dressed in a dress shirt, tie, and slacks, was walking across the street. Luedke asked appellant if anything was wrong and appellant answered that "it looked like there had been a robber in the house." Appellant also told her that he had gone to a 7–11 store to buy bread. Appellant told Luedke that he did not know how his wife and child were because he had not checked on them. Luedke told appellant to call the police and she went to appellant's house to check on his wife and child. The screen door was shut but the front door was open. The sliding glass back door was open. The child's bedroom door was closed and the master bedroom door was open. She looked in the master bedroom and saw Deborah Sue Shipley lying in bed under the bedcovers. Luedke heard a "gurgling sound" coming from the bed; she turned and ran.

The police arrived shortly thereafter, went inside appellant's house and brought Meagan out to appellant. During the time the police were inside investigating the scene of the crime and prior to their bringing the child out, appellant was "wondering what they were doing, what was taking so long." After the police brought the child out, Luedke took the child and appellant then went into his own home.

During this time appellant appeared to be "emotionally upset," he "wrung his hands" and he seemed anxious and nervous. Appellant told the police that he kept a shotgun and pistol under the bed. An antique shotgun was found by the police under the bed but no pistol was recovered.

Luedke testified that she had never seen appellant leave the house that early before and had never seen him dressed that way before. Appellant told Luedke that he had a meeting later that morning but could not reach any of the men to notify them. None of the men testified at trial.

Luedke testified that prior to the shooting, Deborah Sue Shipley had been receiving harassing phone calls.

Officer Kris Hostrup of the Garland Police Department testified that the police recovered a purse on the back porch and a billfold on the outdoor lounge chair. Money was found in the billfold. Officer Hostrup further testified that he observed early morning dew on the grass in the backyard but did not see any footprints in the dew. The backyard was surrounded by a chain link fence. Beyond the fence was an asphalt church parking lot which was adjacent to a major street in Garland. A loaf of fresh bread was found on the front porch. An "extremely fresh loaf of bread" was found inside the kitchen on a shelf "in plain view."

Following the shooting, Deborah Sue Shipley underwent surgery at Methodist Hospital; thereafter, she was placed in the Intensive Care Unit at Methodist Hospital and remained in the I.C.U. for two weeks. She remained in the hospital an additional two weeks. She was then transferred to the Baylor Rehabilitation Center for physical therapy. During her three-month stay in the Baylor Rehabilitation Center she remained wheelchair-bound but could hold her head up and write with her left hand. She was later moved to Walnut Place Nursing Home.

In December of 1985, appellant and another man visited Deborah Sue Shipley in the Walnut Place Nursing Home. According to Theresa Hunt, an L.V.N. who was present during the visit, Deborah Sue "would look at him and turn away" and "she got pale" and "kept taking deep breaths." She further observed that Deborah Sue Shipley began perspiring profusely and refused to continue eating while appellant was present. She had not seen Deborah Sue react in that way prior to this occasion.

Up until December 1985, appellant had paid Deborah Sue's medical expenses. In December of 1985, Deborah Sue Shipley's mother assumed financial responsibility for her care. She was moved to her parents' home and cared for by an L.V.N.

In January of 1986, Deborah Sue Shipley was demonstrating head pains and had to have a brain shunt put in her head to remove fluid. In March of 1986, she had developed flu symptoms and fever; her breathing became "very shallow" and her heart stopped.

Dr. James Weiner, assistant medical examiner, performed an autopsy on Deborah Sue during which he recovered a .22 caliber bullet from her head. He also testified that she died as a result of the "sequela"[1] of a gunshot wound to the head. His expert opinion was that the manner of death was homicide.

Dr. Alan Levinstone, a neurologist, testified that a variety of disorders suffered by Deborah Sue Shipley in the latter part of 1985 and early 1986 were "a direct result of the gunshot wound."

In May of 1985, appellant took Meagan to Tennessee.

■ Sufficiency of the evidence is measured by the standard enunciated by the Supreme Court in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979):

Whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Dickey v. State*, 693 S.W.2d 386 (Tex.Crim.App.1984). A conviction based on circumstantial evidence cannot be sustained if the circumstances do not exclude every other reasonable hypothesis except the guilt of the defendant. *Johnson v. State*, 673 S.W.2d 190, 195 (Tex.Crim.App.1984); *Wilson v. State*, 654 S.W.2d 465, 471 (Tex.Crim.App.1983). Proof amounting to only a strong suspicion or mere probability is insufficient. *Vaughn v. State*, 607 S.W.2d 914, 921 (Tex.Crim.App.1980). It is not required that the circumstances should to a moral certainty actually exclude every hypothesis that the act may have been committed by another person, but the hypothe-sis must be a reasonable one consistent with the facts proved and the circumstances, and the supposition that the act may have been committed by another person must not be out of harmony with the evidence. *Id.; Flores v. State*, 551 S.W.2d 364, 367 (Tex.Crim.App.1977).

■ Reconciliation of any contradictions or conflicts in the evidence is within the province of the jury, and such conflicts will not call for reversal if there is enough credible evidence to support the conviction. *Bowden v. State*, 628 S.W.2d 782, 784 (Tex. Crim.App.1982).

■ Appellant argues that a reasonable hypothesis not excluded by the State was that the offense was "committed by another who fled through the back door, dropping purse and billfold as he left." We disagree. Evidence of appellant's extramarital affairs with two women; his conversations with those women concerning his wife and child; his efforts to persuade one woman to participate in schemes to lead his wife into suggestive poses while photographing them in order to manufacture evidence of her unfitness as a mother; appellant's purchase of a .22 caliber gun shortly before the offense; the fact that a .22 caliber bullet caused his wife's death; and his attempt to purchase a life insurance policy on Deborah Sue Shipley with him as the named beneficiary are all circumstances from which the trier of fact could reasonably conclude demonstrated appellant's planning and premeditative efforts to kill his wife. Additionally, on the morning of the shooting, appellant told Officer McDonald, the first officer on the scene, that he had only been gone for five to seven minutes. Upon returning, he concluded that he had been "robbed" before going into his home, and, believing that, he failed to even go inside to check on his wife and 16–month-old child. During the initial investigation by the police, appellant was very "nervous and anxious," he "wrung his hands" and kept wondering what the police were doing and what was taking so long.

1. Dr. Weiner testified that "sequela" refers to any sort of finding that can be directly related to an event, a prior event.

We believe the facts and circumstances prior to the shooting, combined with appellant's suspicious behavior on the morning of the shooting, the very brief time period involved, and Deborah Sue's reaction to appellant when he visited her in the nursing home in December following the shooting, are sufficient to support the jury's conclusion that the supposition that the act may have been committed by another person was out of harmony with the evidence. The jury was within its discretion to reject the "intruder theory" as being an *unreasonable* hypothesis and to conclude, based on the facts and circumstances surrounding the shooting, that appellant shot his wife, Deborah Sue Shipley, and that her death some months later was a direct result of the gunshot wound to the head. Appellant's sufficiency point is overruled.

Appellant's third contention is that the trial court erred in failing to instruct the jury on the lesser-included offense of attempted murder in the face of appellant's objection. It is well settled that the proper test for determining whether a lesser-included charge is required is: (1) the lesser-included offense must be included within the proof necessary to establish the offense charged; and (2) there must be some evidence in the record that if the defendant is guilty, he is *guilty only of the lesser offense. See Bell v. State*, 693 S.W.2d 434, 439 (Tex.Crim.App.1985); *Royster v. State*, 622 S.W.2d 442, 446 (Tex.Crim.App.1981).

A person commits an offense if, with specific intent to commit an offense, he does an act amounting to more than mere preparation that tends but fails to effect the commission of the offense intended. TEX.PENAL CODE ANN. art. 15.01(a) (Vernon Supp.1986).

■ In order to be entitled to a lesser-included charge there must be some evidence that appellant inflicted a gunshot wound to his wife's head but that such gunshot was not the cause of death. Appellant's "intruder" theory will not support such charge because it fails to meet prong two of the test, i.e., that appellant, if guilty, is *guilty only of attempted murder.* While there was some evidence that Deborah Sue suffered from malnourishment prior to her death and that such malnourishment "increased risk for morbidity and mortality," there is no testimony, expert or otherwise, that such malnourishment was the cause of death. Thus, we conclude that the trial court did not err in failing to instruct on the lesser-included offense of attempted murder because that offense was not raised by the evidence.

■ Appellant's final point of error attacks the constitutionality of the instructions to the jury on the law of parole. *See* TEX.CODE CRIM.PROC.ANN. art. 37.07, § 4 (Vernon Supp.1986). The contention raised by appellant in this point of error has been decided adversely to him in this Court's opinion in *Rose v. State*, 724 S.W.2d 832 (Tex.App.—Dallas, 1986, pet. granted) and *Joslin v. State*, 722 S.W.2d 725 (Tex.App.—Dallas 1986, pet. filed). For the reasons stated in *Rose* and *Joslin*, appellant's final point of error is overruled.

Affirmed.

WHITHAM, J., concurs.

WHITHAM, Justice, concurring.

Without qualification, I join the majority's opinion except its disposition of appellant's complaint with respect to the instruction on parole and good time laws. However, I join the majority's opinion disposing of appellant's complaint with respect to the instruction on parole and good time laws in light of the majority's holding in *Rose v. State*, 724 S.W.2d 832 (Tex.App.—Dallas, 1986, pet. granted). Nevertheless, I remain of the opinion that article 37.07, section 4 of the Texas Code of Criminal Procedure is invalid and unconstitutional for the reasons expressed in my dissent in *Rose*.