Ronald Keith **ALLRIDGE**, Appellant,

v.

**The STATE of Texas, Appellee.**

**No. 69592.**

Court of Criminal Appeals of Texas, En Banc.

May 11, 1988.

Rehearing Denied Sept. 21, 1988.

J. Don Carter (court appointed), Bruce A. Ashworth (court appointed), Fort Worth, for appellant.

Tim Curry, Dist. Atty. and C. Chris Marshall, David Chapman, Sharen Wilson and Greg Pipes, Asst. Dist. Attys., Fort Worth, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

ONION, Presiding Judge.

This appeal is taken from a conviction for capital murder under V.T.C.A., Penal Code,

§ 19.03(a)(2). The death penalty was assessed by the court after the jury returned affirmative findings to both special issues submitted pursuant to Article 37.071(b)(1) and (2), V.A.C.C.P.

On appeal appellant raises twenty-two points of error. Although appellant does not challenge the sufficiency of the evidence to support the conviction, we will briefly discuss the pertinent facts of this cause.

The record reflects that on March 25, 1985, Cary Jacobs, Lisa Jenkins, and Carla McMillen Otto (the deceased) went to a Whataburger Restaurant on Sycamore School Road in Fort Worth around 12:30 a.m. to eat hamburgers. Jacobs testified that halfway through their meal he heard a loud blast and turned to see three black males walking into the restaurant. One of the men carried a shotgun and two carried handguns. The man carrying a shotgun threw a black bag at the deceased and said: "Fill it up, bitch." Jacobs recalled that the bag fell to the ground and that before the deceased could say anything the man shot her. Jacobs identified the appellant as being the same man who shot Otto. Jacobs had also identified the appellant at a police lineup on March 26, 1985.[1]

Appellant next ordered Jacobs to "pick up the bag." After handing appellant the bag and his wallet, Jacobs backed up against a wall with his hands raised. Jacobs then observed the men leaving the restaurant through one of the glass doors which had been shattered by the first shotgun blast.

Melvin Adams, a Whataburger employee who worked the night shift on March 25, 1985, testified that he was waiting on two customers when he heard a gunshot and then noticed an armed man jump over the counter to grab money from an open cash register. Adams recalled that the "light skinned" black male knocked another register to the floor as he jumped over the

counter. The man then jumped back over the counter and fled the restaurant.

While the cash register was being emptied, Adams also heard the appellant saying: " 'Put everything you have in the bag' or something like that." [2] Adams explained that he and the appellant had been co-workers at Domino's Pizza and that he (Adams) recognized appellant's voice immediately. Adams later told the police that he had also recognized the appellant as he ran out of the restaurant. The appellant was identified by Adams in open court.

Adams also testified that he heard a total of two shots and that the second shot followed the first by approximately one minute.

Dr. Marc Andrew Krouse, a physician employed as deputy chief medical examiner of Tarrant County, conducted an autopsy on the deceased on March 25, 1985. Krouse observed that Otto had suffered a large wound to the center of the chest described as a "shotgun injury." Krouse noted that the exact size of the injury was one and three-eighth inches in diameter and that there were certain characteristics indicating that the gun was fired from close range. The doctor estimated that the deceased was shot from a range of about 4½ to 14 or 15 feet, because "the characteristics of the wound are such that the shot had not begun to separate significantly from a large column." Dr. Krouse also described the "wound track" as passing from left to right through the right lung, as well as lacerating the right atrium of the heart. The shot also passed into the right posterior chest and came to rest along the right side of the armpit. The cause of death was "hemorrhagic shock," which caused the victim to bleed to death.

Appellant was arrested at his apartment a few hours after the commission of the offense. Paul Kratz, a detective at the time of the offense, testified that appellant

---

1. Appellant's objection that Jacobs' in-court identification was based on an impermissibly suggestive lineup was overruled.

2. Adams' statement given to the police actually stated that after the first man jumped back over

the counter, he heard another man yell something like, "Give me the bag." Adams told the police that as soon as he heard the voice, he recognized it as the voice of Ronnie Allridge whom he had worked with at Domino's Pizza.

was arrested in the presence of his common-law wife, Kathy Jarmon, who signed a consent to search form.[3] Pursuant to her consent to search, Kratz had the apartment and two vehicles parked near the residence searched. Officer Brad Patterson testified that the search of appellant's apartment produced a loaded .22 caliber pistol which was shown to have been fired once, nineteen .22 caliber bullets, and a black nylon bag. All of the items were found between the mattress and box springs of appellant's bed. A .25 caliber semiautomatic handgun was found in a separate bedroom.

Patterson also testified that he searched two vehicles parked outside of appellant's apartment, a 1972 Chevrolet and a 1981 Datsun. The search of the Chevrolet produced a shotgun containing two live shells in the magazine, and a spent shell located in the chamber. The State rested at the conclusion of Patterson's testimony.

Sharon Burns, a "graveyard" manager at Whataburger, testified for the defense. Burns stated that on the night of the offense she observed a black male knock over a cash register as he jumped over the counter for the second time. The register landed in the customer area of the restaurant. Burns also noted that she heard "two or three" popping sounds, although she did not see any of the other accomplices.

Teresa Barton, a customer at the Whataburger, testified as a defense witness that she and a friend (Lenore) were standing at the counter waiting for change when the armed men entered the restaurant. Barton noticed a man with "a long rifle, a long gun," wearing a bright orange or red ski mask. The witness also recalled hearing two shots fired within seconds of each other. On cross-examination it was established that Barton and several friends had been drinking that night, and that she and Lenore went to get something to eat because they were drunk.

Jack Benton, a forensic chemist and firearms examiner called by the defense, identified a .25 automatic caliber cartridge case found at the scene. Benton also tested the "trigger pull" of the shotgun to determine the force required to make the weapon discharge. He determined that the force necessary to pull the trigger of this particular shotgun was 2.5 pounds. Benton found 2.5 pounds of required pressure to be "extremely low," but would not categorize the trigger to be a hair-trigger. Instead, Benson stated: "In my opinion, a hair-trigger is any trigger that applies the force of two pounds or less." On cross-examination it was revealed that Benson had tried to make the shotgun go off accidentally and failed.

The State called Frank Shiller, director of the Fort Worth Police Department Crime Laboratory, as a rebuttal witness. Shiller had also tested the "trigger pull" of the shotgun used during the robbery, and determined the trigger pull to be four pounds. Shiller also conducted test firings of the shotgun to be compared with the clothing worn by the deceased at the time of the shooting. Shiller's conclusion was that "the firing distance from the muzzle of the gun to the target, being the shirt, was less than five feet, but more than contact or near contact."

In his first point of error appellant contends that the trial court erred in overruling his "Exception No. 1" to the indictment.[4] Specifically, he argues that the indictment was defective since "the State must not only allege an intentional murder under V.T.C.A., Penal Code, § 19.02(a)(1), but must further allege that the murder was intentionally committed in the course of committing or attempting to commit one of the enumerated underlying felonies in the section [V.T.C.A., Penal Code, § 19.03(a)(2)]." The indictment, in relevant part, alleged that:

"RONALD KEITH ALLRIDGE ... on or about the 25TH day of MARCH, 1985,

3. Although the police had a warrant for appellant's arrest, no search warrant was procured prior to the arrest.

4. On September 18, 1985, appellant filed a written motion with the court titled "Defendant's Exceptions To The Indictment." Following a pretrial hearing, the trial court overruled appellant's motion.

did then and there intentionally cause the death of an individual, Carla McMillen Otto, by shooting her with a deadly weapon, to-wit: a firearm, and the said RONALD KEITH ALLRIDGE was then and there in the course of committing and attempting to commit the offense of robbery and aggravated robbery of Carla McMillen Otto; ..."

Appellant's second point of error advances the same argument as it applies to the court's jury charge, alleging that the court erred in refusing his requested instruction on "dual intent" in the capital murder portion of the charge applying the law to the facts. Appellant cites *Lamb v. State,* 680 S.W.2d 11 (Tex.Cr.App.1984), *cert. den.* 470 U.S. 1009, 105 S.Ct. 1372, 84 L.Ed.2d 391 (1985), and *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App.1976), for the proposition that "it is not sufficient merely that a murder be intentional, it must be further shown that such intentional murder, if any, was done intentionally in the course of committing or attempting to commit the underlying felony." The record reflects that appellant requested an instruction applying the law to the facts in which the jury would have been required to find that appellant intentionally caused the death of the deceased and that the murder was intentionally committed in the course of a robbery or aggravated robbery. The requested instruction was overruled.

This Court recently addressed the issue of "double intent" and whether a capital murder indictment must allege both an intentional murder *and* an intentional robbery. *Demouchette v. State,* 731 S.W.2d 75, 79 (Tex.Cr.App.1986). As in the instant case, Demouchette argued that when §§ 19.02(a)(1) and 19.03(a)(2) are combined, "a person commits capital murder who intentionally causes the death of an individual while intentionally doing so in the course of committing or attempting to commit robbery." *Demouchette,* supra, at 79–80. We held that the capital murder statute has no "death intent" requirement, and that the elements of the aggravating offense need not be set out in that portion of the charge applying the law to the facts. See also *Granviel v. State,* 723 S.W.2d 141, 157

(Tex.Cr.App.1986); *Garrett v. State,* 682 S.W.2d 301, 308–09 (Tex.Cr.App.1984).

Similarly, in *Ellis v. State,* 726 S.W.2d 39, 45 (Tex.Cr.App.1986), we explained that capital murder under § 19.03(a)(2), supra, proscribes an intentional killing in the course of an aggravating offense, and rejected the defendant's efforts to "have the indictment read 'intentionally knowingly and intentionally caused the death.'" Based on the preceding precedent, and finding the *Lamb* and *Livingston* cases to be inapposite, we overrule appellant's first two points of error.

Appellant's third point of error alleges that the trial court erred in refusing to admit his written statement into evidence at the guilt-innocence stage of trial when he offered the same. The record reflects that appellant was arrested around 11:20 a.m. on March 25, 1985. Later that day appellant made two written statements, completing one at 6:06 p.m. and the other at 7:05 p.m. Appellant's second statement was hand written and later typed up in identical form. The first statement implicated one of the accomplices, Milton Ray Jarmon, as carrying the shotgun and shooting the victim. The second statement declared that appellant wielded the shotgun and shot the victim after panicking. Specifically, appellant claimed: "Someone shot the window out and when they did I panicked and shot a girl seated in a booth." Appellant sought to introduce this second statement to show that the shooting was not an intentional act.

At trial, appellant called Detective Kratz as a witness to offer the statement into evidence. Outside the jury's presence the State requested a motion in limine "to instruct Defense counsel not to attempt, through this witness or any other witness, to go into any matters concerning a statement that may have been given by the Defendant to Mr. Kratz on the basis that a statement is admissible only if offered by the State." The State argued that the statement was self-serving and constituted inadmissible hearsay. Appellant countered that the statement had been voluntarily given and was therefore admissible

through Detective Kratz. Alternatively, appellant offered to introduce both typed statements, as well as the handwritten statement which had been re-typed. The trial court ruled that both statements, including the handwritten version, were hearsay and self-serving and thus inadmissible to be introduced by the defense.

After the witness (Detective Kratz) was excused, appellant re-offered the statements on the basis they were admissions against interest admissible as exceptions to the hearsay rule. Appellant argued that the statements were not being offered for the truth of their contents, but rather "that they are evidence and were taken by Detective Kratz as admissions against interest." Appellant's offers were overruled, with the explanation that the State would not be able to cross-examine the statements.

After the State rested its case on rebuttal, appellant again attempted to re-offer the statements through Detective Kratz. Appellant argued that (1) the statements were res gestae of the offense or the arrest or both, and (2) they rebutted the State's theory of an intentional murder. Again, the evidence was refused. It should also be noted that appellant did not testify in his defense, and that the State did not attempt to offer any of the statements into evidence.

It is the rule in Texas that self-serving declarations are not admissible in evidence as proof of the facts asserted. 24 Tex. Jur.3d, Criminal Law, § 3058, p. 237. There are, however, exceptions to this general rule, which permit introduction of such proof. In *Singletary v. State*, 509 S.W.2d 572, 576 (Tex.Cr.App.1974), this Court noted that "self-serving declarations of the accused are ordinarily inadmissible in his behalf, unless they come under some exception, such as: being part of the res gestae of the offense or arrest, or part of the statement or conversation previously proved by the State, or being necessary to explain or contradict acts or declarations first offered by the State." See also *Reado v. State*, 690 S.W.2d 15, 17 (Tex.App.— Beaumont 1984, PDR ref'd). Unless appellant's statements fall under any of the enu-

merated exceptions, they are not admissible into evidence.

One of the factors for determining a res gestae statement in this State is "spontaneity." *Rubenstein v. State*, 407 S.W.2d 793, 795 (Tex.Cr.App.1966). This principle was explained early on in *Trammell v. State*, 145 Tex.Cr.R. 224, 167 S.W.2d 171, 174 (1942), in which we wrote:

"For a statement to be a part of the res gestae, the declaration must deal substantially with, and must grow out of, the main fact so as to be spontaneous and not, in any event, a narration of a past event or occurrence. Above everything else, there must exist that spontaneity which takes the statement out of the realm of narration or premeditation."

In *Singletary*, supra, at 577, we elaborated on this standard, noting: "These principles embrace such factors as time elapsed, and, more importantly, spontaneity, or whether the statement was instinctive. See *Fisk v. State*, 432 S.W.2d 912 ([Tex.Cr.App.] 1968)."

In the instant case appellant made his statements approximately seventeen to eighteen hours after the offense and seven to eight hours after his arrest. Cf. *Spruill v. State*, 624 S.W.2d 779, 782 (Tex.App.— Fort Worth 1981). (Self-serving statement which the defendant tried to adduce at trial was not res gestae, but rather was made a considerable length of time after the shooting when things had calmed down and after defendant had ample time to consider and calmly reflect on what had happened.) At the earlier motion to suppress the confessions hearing Detective Kratz had testified that appellant was given the statutory warnings at the time of his arrest, that appellant signed an "adult warning" form before a magistrate, and that he was again informed of his rights before giving his statements. At no time did appellant request an attorney or invoke his right to remain silent. After being allowed to make two (uncompleted) phone calls, appellant gave "a fairly detailed oral statement of the offense naming Milton Jarmon as the person who shot." When Kratz confronted appellant with the fact that a wit-

ness had identified him as the gunman who had shot the victim, appellant requested a pen and paper and wrote out a second statement implicating himself in the murder.

> "The fact that the statement was made by the appellant as a result of custodial interrogation containing his narration of the occurrence disproves the controlling element of spontaneity and instructiveness." *Singletary*, supra, at 577.

Kratz testified that at no time was appellant coerced or given promises of leniency to cooperate.

Furthermore, appellant's statements were clearly made after a period of reflection and deliberation, since his initial statement was an obvious fabrication. In *Singletary*, supra, at 577, we also noted: "Such explanation passes from the domain of res gestae and becomes obnoxious as self-serving when the opportunity for reflection arises and fabrication is manifested to suit the exigencies of his situation." Clearly, the confessions were not part of the res gestae of the offense or arrest.

■ Appellant's confessions were also not admissible as statements previously proven by the State, since none of the statements or parts thereof were introduced into evidence. Consequently, the rule of "completeness," which takes effect only when other evidence has already been introduced but is incomplete and misleading, does not apply. See *Reado*, supra, at 17; Article 38.24, V.A.C.C.P. (in effect at the time of trial); now see Tex.R.Crim. Evid., Rule 107. Nevertheless, appellant argues that the introduction of the self-serving statement was necessary to explain or contradict acts or declarations first offered by the State. We disagree. During the State's presentation of its case-in-chief, no exculpatory or explanatory testimony favoring the appellant was introduced. The State did not mislead the jury or leave the jury with only a partial or incomplete version of the facts. Cf. *Trammell*, supra, at 175 ("Under the facts of this case, the rejected testimony was a part of, and was explanatory of, the incriminative facts which the State had developed upon its cross-examination of the witness.") As noted in *Reado*, supra, at 17: "To adopt Appellant's position would mean that all self-serving statements by an accused would be admissible." See and cf. *Hollins v. State*, 661 S.W.2d 211 (Tex.App.—Houston [1st] 1983) (Excluded testimony of defense witness who testified out of the jury's presence that the defendant had stated that the gun discharged accidentally after he had placed it in the victim's face.)

■ Finally, appellant contends that the introduction of his statements was required by V.T.C.A., Penal Code, § 19.06, which provides:

> "In all prosecutions for murder or voluntary manslaughter, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense."

Appellant also claims that he was harmed by the failure of the Court to permit introduction of his statements before the jury in that:

> "(1) he did not receive an instruction on a lesser included offense to which he would have been entitled thus giving the jury some alternative to conviction or acquittal for capitol (sic) murder, and (2) Appellant would have been able to argue before the jury based on the evidence and in contrast to the argument of the state that the killing was unintentional." (Appellant's Corrected Brief, pp. 22–23)

We note initially that § 19.06, supra, has been held to apply to capital murder. *Lamb v. State*, supra, at 16–17. Nevertheless, it is settled that § 19.06, supra, does not extend the rules of evidence to admit hearsay testimony that would otherwise be inadmissible. *Werner v. State*, 711 S.W.2d 639, 644 (Tex.Cr.App.1986); *Van Byrd v. State*, 605 S.W.2d 265, 269, n. 1 (1980); *Fazzino v. State*, 531 S.W.2d 818, 820 (Tex. Cr.App.1976); *Erwin v. State*, 531 S.W.2d 337 (Tex.Cr.App.1976); *Jones v. State*, 515

S.W.2d 126 (Tex.Cr.App.1974). As a result, § 19.06 does not serve as an exception to the prohibition against admitting self-serving confessions. Cf. *Binyon v. State*, 545 S.W.2d 448, 452 (Tex.Cr.App.1976) (Where the same facts set out in the statement were already in evidence from other witnesses.). Appellant's third point of error is overruled.

■ Appellant's next point of error alleges that the trial court erred in overruling appellant's requested instruction on the law of felony murder as a lesser included offense where the same was raised by the evidence. The record indicates that appellant requested the following instruction pursuant to V.T.C.A., Penal Code, § 19.02(a)(3):

"Our law provides that a person commits murder if he commits or attempts to commit a felony, other than voluntary or involuntary manslaughter and in the course of and in furtherance of the commission or attempt, or in the immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

"Now, if you find from the evidence beyond a reasonable doubt that on or about the 25th day of March, 1985, in Tarrant County, Texas, the Defendant, Ronald Keith Allridge, did commit or attempt to commit the offense of robbery, and that while in the commission of the attempt or—the attempt to commit said robbery, or in the immediate flight from the commission of or the attempt to commit such robbery, if any, the Defendant did intentionally, knowingly or recklessly commit an act clearly dangerous to human life under the circumstances then existing, to wit: pointing a loaded shotgun at Carla McMillen Otto and that it caused the death of Carla McMillen Otto, then you will find the Defendant guilty of murder.

"Unless you so find beyond a reasonable doubt, or if you have a reasonable doubt thereof, you will acquit the Defendant."

While the trial court overruled appellant's special requested charge, the court did include a charge on murder as a lesser included offense, pursuant to V.T.C.A., Penal Code, § 19.02(a)(1).

In determining whether a charge on a lesser included offense is required, a two-step analysis is applied:

"First, the lesser included offense must be included within the proof necessary to establish the offense charged. Secondly, there must be some evidence in the record that if the defendant is guilty, he is guilty of only the lesser offense."

*Royster v. State*, 622 S.W.2d 442, 446 (Tex. Cr.App.1981) (Opinion on Rehearing); see also *Moreno v. State*, 721 S.W.2d 295, 301–02 (Tex.Cr.App.1986); *Godsey v. State*, 719 S.W.2d 578, 584 (Tex.Cr.App.1986); *Santana v. State*, 714 S.W.2d 1, 8 (Tex.Cr.App. 1986); *Hewitt v. State*, 734 S.W.2d 745, 748 (Tex.App.—Fort Worth 1987); *Shipley v. State*, 727 S.W.2d 118, 124 (Tex.App.—Dallas 1987). V.T.C.A., Penal Code, § 19.03(c), specifically provides that if the jury does not find beyond a reasonable doubt that the defendant is guilty of capital murder, he may be convicted of murder or of any other lesser included offense. In the instant case, as in *Santana*, supra, felony murder is a lesser included offense of the charged capital murder, with the only difference in the two offenses being the culpable mental state. "In capital murder, there must be an intent to kill, while in the felony murder, there must only be an intent to commit the underlying offense, in this case robbery." *Santana*, supra, at 9. The instant case satisfies the first part of the *Royster* test.

The evidence does not, however, support a finding that appellant is guilty *only* of the underlying felony murder. To establish that a lesser culpable mental state was raised by the evidence, appellant relies on the defense testimony of Jack Benton concerning the "extremely low" trigger pull of the shotgun used to kill the victim. As previously discussed, the evidence showed that Benton tested the weapon and determined that the force required to pull the trigger was 2.5 pounds. However, Benton did not characterize the trigger as being a "hair-trigger" and he had in fact failed to

make the gun go off accidentally. A separate test conducted by Frank Shiller showed the trigger pull to be four pounds.

We agree with the State that there is no evidence that appellant did not intend to kill the victim, and more importantly, "[t]he mere fact that the murder weapon had a light trigger pull does not, without more, establish that the weapon was fired without an intent to murder." We therefore find that the evidence shows not only the intent to commit robbery, but also the intent to kill. We further hold that the trial court did not err in overruling the special requested charge, since the evidence did not raise the issue of felony murder. This point of error is overruled.

In his fifth point of error appellant contends that he was entitled to a mistrial because of an improper jury argument by the State at the guilt stage of the trial. The specific argument complained of reads as follows:

"MR. PIPES (Prosecutor): ... I would submit to you, ladies and gentlemen, that we could have proven that this was the gun that caused the death of Carla McMillen Otto, had he re-chambered that shell—another shell into that—

"MR. CARTER: Objection, Your Honor. He's outside the record, speculating and conjuring evidence for the jury to consider.

"THE COURT: Sustained.

"MR. CARTER: We would ask that the Court instruct the jury not to consider the other evidence that's been place[d] before them for any reasons.

"THE COURT: Ladies and gentlemen you will not consider Mr. Pipes' last remark for any purpose.

"MR. CARTER: Your Honor, at this time, because of the nature of the remark, we would ask for a mistrial, that the jury cannot possibly remove those remarks from their minds.

"THE COURT: Overruled."

It has been frequently noted by this Court that proper jury argument must fall within one of four general categories: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement. *Alejandro v. State,* 493 S.W.2d 230, 231 (Tex.Cr.App.1973); *Bell v. State,* 724 S.W.2d 780, 802–03 (Tex. Cr.App.1986); *Denison v. State,* 651 S.W. 2d 754, 761 (Tex.Cr.App.1983); *Darden v. State,* 629 S.W.2d 46, 52 (Tex.Cr.App.1982); *Todd v. State,* 598 S.W.2d 286, 296–97 (Tex. Cr.App.1980). Error exists when facts not supported by the record are interjected; however, such error is not reversible unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute or injects new facts, harmful to the accused, into the trial. *Cannon v. State,* 668 S.W.2d 401, 404 (Tex.Cr.App.1984); *Phillips v. State,* 701 S.W.2d 875 (Tex.Cr.App. 1985), *cert. denied,* 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574 (1986); *Franklin v. State,* 693 S.W.2d 420, 429 (Tex.Cr.App. 1985); *Brown v. State,* 692 S.W.2d 497, 502 (Tex.Cr.App.1985); *Todd v. State,* supra, at 97. The test for reversible error in jury argument is whether there is a reasonable possibility that the argument complained of might have contributed to the conviction or the punishment assessed. *Garrett v. State,* 632 S.W.2d 350, 354 (Tex.Cr.App. 1982); *Saylor v. State,* 660 S.W.2d 822, 824 (Tex.Cr.App.1983); *Lett v. State,* 727 S.W. 2d 367, 370 (Tex.App.—Fort Worth 1987, PDR granted); *Buckner v. State,* 719 S.W. 2d 644, 647 (Tex.App.—Fort Worth 1986). See also *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967). Therefore, it becomes necessary to look at the evidence adduced at both stages of trial in making this determination. *Garrett,* supra, at 354.

Testimony given by Jack Benton during the guilt stage of the trial focused on the shotgun used during the offense, and explained "how a shell is ejected and injected from into that weapon." It was shown that the ejection of a spent shell required an intentional pumping action. Such a pumping action is sometimes referred to as chambering. The replacement of a new shell into the chamber was described as "rechambering." Benton deduced that since a spent shell was left in the chamber,

no one had ejected the shell by manually pumping the shotgun. There was no spent shell found at the scene.

■ The State asserts that the prosecutor made a reasonable deduction by arguing that if appellant had rechambered another shell, the spent shell would have been ejected and found at the scene. "It is well settled that the prosecutor may argue his opinions concerning issues in the case so long as the opinions are based on the evidence in the record and do not constitute unsworn testimony." *Ngoc Van Le v. State*, 733 S.W.2d 280, 286–87 (Tex.App.— Houston (14th Dist.) 1987) [citing *McKay v. State*, 707 S.W.2d 23, 37 (Tex.Cr.App.1986), cert. denied, 479 U.S. 871, 107 S.Ct. 239, 93 L.Ed.2d 164 (1986)] Furthermore, counsel in argument may draw from the facts in evidence all inferences that are reasonable, fair, and legitimate. *Williams v. State*, 688 S.W.2d 486 (Tex.Cr.App.1985); *Denison v. State*, supra, at 761–62; *Jordan v. State*, 646 S.W.2d 946, 948 (Tex.Cr.App. 1983); *Carter v. State*, 614 S.W.2d 821, 823 (Tex.Cr.App.1981); *Ngoc Van Le*, supra, at 287. We find that the prosecutor's comment was a reasonable deduction in light of *all* the evidence presented. Further, any possible error was cured by the court's instruction to disregard. *Sawyers v. State*, 724 S.W.2d 24, 38 (Tex.Cr.App.1986); *Boyd v. State*, 643 S.W.2d 700, 706–707 (Tex.Cr. App.1982). Appellant's point of error is therefore overruled.

■ In his sixth point of error appellant urges that the trial court erred in overruling his objection and admitting, at the penalty stage of the trial, State's Exhibit No. 37, a "pen packet," reflecting a prior murder conviction in 1977. Appellant contends that at the time he was a juvenile and was not afforded an examining trial and that the conviction is void in light of V.T.C.A., Family Code, § 54.02(h), and *Ex parte Gilbert*, 593 S.W.2d 685 (Tex.Cr.App.1980). See also *Wooldridge v. State*, 653 S.W.2d 811, 812–813 (Tex.Cr.App.1983); *Robinson v. State*, 707 S.W.2d 47 (Tex.Cr.App.1986); *Ex parte Menefee*, 561 S.W.2d 822 (Tex.Cr. App.1977).

It is the State's argument that the State made a prima facie showing of a valid conviction by introducing the "pen packet" including the judgment and sentence and identifying the appellant with the said conviction, and the burden then shifted to the appellant to show such defect as would render the conviction void. See *Johnson v. State*, 725 S.W.2d 245 (Tex.Cr.App.1987); *Acosta v. State*, 650 S.W.2d 827 (Tex.Cr. App.1983); *Hankins v. State*, 646 S.W.2d 191, 200 (Tex.Cr.App.1983) (Opinion on rehearing); *Smith v. State*, 683 S.W.2d 393, 406 (Tex.Cr.App.1984).

At a hearing outside the presence of the jury prior to the penalty stage of the trial the appellant offered Defense Exhibit No. 6 for the purpose of the trial record. Such exhibit contained a certified copy of the trial court's record pertaining to appellant's prior murder conviction. The record reflected that on June 23, 1976, the juvenile court judge signed an order waiving jurisdiction and certifying appellant to be tried as an adult. The order transferred the cause to the Criminal District Court No. Four of Tarrant County. On September 14, 1976, the indictment was returned into the 213th District Court of Tarrant County, but the cause (8295) was transferred to the Criminal District Court on September 16, 1976. A document entitled "Certification of Proceedings" and dated September 9, 1976, was in the exhibit and it made no express mention of an examining trial prior to the indictment on September 14, 1976.

In response the State called Lucy Lopez, official court reporter for the said Criminal District Court No. Four. She testified that her personally kept card file showed that on September 9, 1976, a date prior to the date of the indictment, she had taken the testimony at an examining trial for the appellant. The card reflected the date, appellant's name, that it was an examining trial, the name of the lawyers and "J P 41702." Lopez observed that "JP 41702" was also reflected on the indictment in Cause No. 8295. She could not identify the appellant and could not personally recall taking the testimony, but stated her notes from the examining trial were in the ware-

house and a search would be necessary to find them.

Following Lopez's testimony the trial judge observed that Defense Exhibit No. 6 offered by the appellant showed subpoenaes had been issued for an examining trial on September 9, 1976, and that other parts of said exhibit reflected the case was "held over to the Grand Jury, Defendant to be held without bond, the Court accepted jurisdiction." Finding that the record indicated that an examining trial was held, appellant's objection to proof of the prior conviction was overruled.

The appellant did not sustain his burden to show a defect in the prior conviction so as to render it void. In *Johnson*, supra, the defendant objected to the proof of a prior conviction because he was a juvenile at the time and there was no proper order of certification or transfer from the juvenile court to the district court included in the "pen packet" relating to the prior conviction. The claimed error on appeal was rejected because the defendant did affirmatively show the prior conviction was void as he alleged. *Johnson*, supra, at 247.

In *Smith*, supra, the defendant had objected that the State failed to prove a waiver of indictment in a prior Colorado conviction being offered for enhancement purposes. There, as in *Johnson*, after the State made its prima facie showing of a valid conviction and identifying the defendant with it, the burden shifted to the defendant and he did not sustain it in order to show the conviction void.

Appellant's contention is overruled.

In another point of error (No. 7) the appellant urges that the "trial court erred in permitting the State at the punishment phase of the trial to introduce portions of a statement (State's Exhibit No. 34) taken from appellant relating to extraneous offenses, where the statement was not taken in compliance with Tex.Code Crim.Proc. Ann. article 38.22."

■ At the outset we observe that while appellant made trial objections to the introduction of State's Exhibit No. 34, they were not on the basis now urged on appeal. Thus, nothing was preserved for review on appeal. *Ex parte Bagley*, 509 S.W.2d 332, 333–334 (Tex.Cr.App.1974). The error presented on appeal must be the same as the objection raised on at trial. *McIlveen v. State*, 559 S.W.2d 815 (Tex.Cr.App.1977); *Vanderbuilt v. State*, 629 S.W.2d 709 (Tex. Cr.App.1981); *Burdine v. State*, 719 S.W. 2d 309 (Tex.Cr.App.1986); *Losada v. State*, 721 S.W.2d 305 (Tex.Cr.App.1986). The requirement of a trial objection applies with equal force to alleged *Miranda* [5] or Article 38.22, supra, violations. *Bagley*, supra; *Gauldin v. State*, 683 S.W.2d 411 (Tex.Cr. App.1984); see also *Ranson v. State*, 707 S.W.2d 96, 99 (Tex.Cr.App.1986).

■ The confession here involved admissions as to the commission of extraneous offenses of robbery, or rather aggravated robbery. It is appellant's contention that Officer J.J. Lee, who took the confession, did not give appellant the statutory warnings (Article 38.22, supra) prior to commencing the custodial interrogation and gave the necessary warnings just before the appellant read and signed the confession which was the typed version of the events which appellant had related to Lee. Appellant does not dispute the fact that the warnings were also on the statement form which appellant read and signed or that Lee knew the appellant had previously been taken before a magistrate and warned two days before.

The record reflects that appellant was warned of his rights when he was arrested on March 25, 1985; that he was warned of these rights by a magistrate at 4 p.m. on March 25, 1985, albeit in connection with another offense than the aggravated robberies. It was shown he was warned again of his rights by Detective Kratz shortly after being warned by the magistrate. He was again warned of his rights by Detective Brannon the next day, March 26, 1985, when a confession was given to a robbery other than the one involved in the instant case. Then, on March 27, 1985, Detective Lee began his interrogation of the appel-

---

**5.** *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct.    1602, 16 L.Ed.2d 694 (1966).

lant without further repeating any warnings at that time but knowing that appellant had previously been warned by the magistrate. The statement given related to extraneous robberies, but before it was read and signed, Detective Lee again gave the statutory warnings required. The statement also contained the warnings.

In *Dunn v. State*, 721 S.W.2d 325, 338 (Tex.Cr.App.1986), this Court stated:

"Neither our constitutional nor statutory law requires that a defendant be rewarned where there is a transition from questioning him regarding one offense to questioning him regarding another offense, nor have we found any requirement in our law that the *Miranda* warnings must be limited to any specific unlawful conduct; nor do we know of any reason which requires that it be so limited, considering the purpose of the *Miranda* rule. Cf. *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977); *Michigan v. Mosely*, 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975)."

Further, under Article 38.22, supra, a written confession of the type involved here is not admissible unless signed, so in the true sense of the word the confession was not "obtained" until the appellant affixed his signature thereto. *See Nehman v. State*, 721 S.W.2d 319, 323 n. 2 (Tex.Cr.App.1986). Before the confession (State's Exhibit No. 34) Detective Lee gave the proper warnings.

Given the circumstances here presented, we find no merit to appellant's contention that the statement was admitted in violation of Article 38.22, supra, even if he had timely objected on that basis. The point of error is overruled.

Appellant combines points of error eight through fifteen, alleging that the trial court erred in permitting the State to offer the testimony of several witnesses pertaining to extraneous offenses not connected to appellant. Before addressing the legal issue involved, we will briefly summarize the testimony of the eight witnesses who testified at the penalty stage.

Following the testimony of the magistrate and Detective Lee mentioned previously, Thomas Browning, an assistant manager at a Fort Worth Pizza Hut near Camp Bowie Street, testified that he was working on February 7, 1985, when a lone gunman held up one of the waitresses. Browning stated that the gunman turned a small caliber pistol on him, and that he (Browning) went to the register to give the robber some money. Browning did not identify appellant and defense counsel's objection that Browning's testimony had not linked appellant to the extraneous offense was overruled.

State's Exhibit No. 34, as previously discussed, contained a reference to an armed robbery committed by appellant and Clarence Jarmon at a Pizza Hut on Camp Bowie in February or early March, 1985. Appellant's statement noted that while Jarmon stood by the door holding a shotgun, appellant informed "a black girl there" that he was committing a robbery. When the girl failed to move, the assistant manager, according to appellant, came to the front, opened the cash register, and gave appellant the money.

The next witness called by the State was Olivia McGee, a part-time waitress at the Pizza Hut. She testified that a man came into the restaurant on February 7, 1985, carrying a small handgun. McGee "just kind of froze" when she saw the second gunman standing at the door holding a shotgun, and stated that Browning had to open the register to get at the money. After the gunman received the money, he and the man at the door backed out of the restaurant and left. McGee did not identify appellant, although she stated on cross-examination that he was not in disguise and only wore a baseball cap. Appellant did not object when the prosecutor read the relevant portion of appellant's written statement to the jury connecting him with said offense.

Darlene Allen, who worked at Jamie's Food Store on Sycamore School Road, testified that on January 29, 1985, a young black man walked to the counter and asked for a pack of cigarettes before pulling out a gun and asking for money. Following a very brief cross-examination, defense coun-

sel made "a motion" to have the testimony of the previous three witnesses stricken, "in that no connection has been shown to the Defendant, Ronald Keith Allridge at this time." Appellant's "motion" was overruled.

At this point the prosecutor was permitted to read another portion of State's No. 34 to the jury. In his statement concerning the robbery at "Jamie's" appellant had written that he went in and asked for a package of Kool Longs, and that a black female clerk had given him the money after he pulled his gun and said, "Give me the money."

Bernie Springer, the manager of the Italy by the Sea restaurant, next testified that on February 15, 1985, he and the owner of the restaurant, Jack Malone, were robbed by a man holding a pistol and wearing a nylon stocking over his head. Springer could tell the gunman was black. Springer recalled that he raised his hands and walked over to the register, took the money out of the register and laid it on the counter. The gunman took the money, turned and walked out. Springer noted that the robbery took place around 11:50 p.m. After Springer activated the alarm he noticed the gunman and another "short and stocky" person walk past the front window of the restaurant. Springer testified that he went to the back door of the restaurant and through a peep hole watched the two men walk by. When the men were approximately 100 yards away, Springer opened the door and yelled at them. He testified: "I don't know why, but I yelled at them. And the other guy pointed towards me and the robber raised the gun, and I closed the door, and he shot and—."

On cross-examination Springer conceded that he could not identify appellant as the gunman, because of the stocking the robber was wearing. Appellant again moved "to have this gentleman's testimony excluded, and also the other witnesses that have testified previously." Appellant's objection, on the basis that Springer's testimony was immaterial and failed to tie into the appellant, was overruled.

Jack Malone also testified that an armed man entered his restaurant around "ten til midnight" on February 15, 1985, leaned over the counter with a pistol and demanded money. While Malone took his wife and daughter to a walk-in cooler for safety, Springer gave the armed robber the money. By the time Malone returned to the front of the restaurant the gunman had already left. Defense counsel again objected to this testimony as not being connected to the appellant and therefore not material. Both objections were overruled.

Yet another portion of State's Exhibit No. 34 was read to the jury, detailing the armed robbery at Italy by the Sea. In his statement appellant explained that he wore a stocking mask and had his gun out as he approached the register, while Clarence Jarmon stood by the door with a shotgun. Appellant noted that when "a guy at the register" saw his gun, he opened the register and handed over the money without saying anything. Appellant recalled that the robbery took place around 11:00 p.m.

The State next called Charles Moche, an assistant manager at Domino's Pizza on West Berry Street. Moche testified that appellant had been a former employee at Domino's. Moche further testified that on March 1, 1985, he noticed a "suspicious" looking black male at the store window. When Moche went outside to see what the man wanted, the stranger followed him into the employees entrance and pulled a gun. Moche recalled that there were fifteen to twenty people in the store, and that the gunman pointed his pistol at everyone and "told us to give him all the money." At this point a tall man "went to the till" and gave the gunman all of the money, which was then placed into a grey plastic bag the gunman had brought with him. Moche testified that the gunman was *not* the appellant, but rather the shorter accomplice.

Again, defense counsel moved to have this testimony withdrawn, because it had not been connected to the appellant. The objection was overruled, and the State read another portion of State's Exhibit No. 34 to the jury. Appellant's statement related an

armed robbery at Domino's Pizza by Clarence Jarmon. Appellant noted that he did not go in, "because I had worked there and everyone knew me." Instead, appellant waited outside by a tree holding a shotgun. When Jarmon came running out of the store, both men got into a car and drove away.

Appellant also complained about the testimony of Gordon Keiser, a package car driver for United Parcel Service, who testified that he went to Mama's Pizza on Wedgewood on March 1, 1985, where he was "held up." Keiser was accompanied by his wife that evening, when two armed men walked into the restaurant. Keiser recalled that "one was rather short, and had a handgun, a revolver, and the other one was tall and slim, and had a shotgun."

"Q. What happened the first time you saw either one of those two inside the store?

"A. The short man went to the cash register, and the man with the pistol—and the tall, thin man pointed the shotgun at me and told me to empty the contents of my wallet into his black nylon athletic bag that he took out of his coat, threw it on the floor in front of me."

Keiser then collected money from the other customers, placing it into the black bag provided by the gunman. Keiser returned the bag to the man holding the shotgun, who then left together with his shorter accomplice.

On cross-examination Keiser admitted that he was unable to identify either of the armed robbers, and that he had concentrated primarily on the shotgun which had been pointed at him most of the time.

The State again read to the jury from appellant's statement, which described his involvement in the armed robbery at Mama's Pizza. Appellant had confessed that he and Clarence Jarmon had parked on Wedgway (sic) Street around 11:00 p.m. and entered the restaurant through the side door. Appellant recalled that he went in first carrying a shotgun, followed by Jarmon who carried a pistol. While Jarmon stood guard by the register, appellant

ordered a male customer "to pass the bag around." The gunmen left once the bag was returned to appellant. Defense counsel's objection on the same basis previously voiced was overruled.

Loretta Hamilton, a waitress at the International House of Pancakes on Seminary Drive, also testified about an armed robbery which took place on March 10, 1985. Hamilton recalled seeing four men enter the IHOP restaurant and noticed that each of them carried guns, including two shotguns. One of the gunmen instructed a customer to take a bag around the restaurant and collect money from everyone. The gunmen left the restaurant after collecting the customers' money, and never requested that the cash register be opened. On cross-examination Hamilton explained that two of the gunmen wore stocking masks, while one of the other two wore a baseball cap. Appellant's objection to the testimony was overruled.

Alexander Willing also testified about the armed robbery at the IHOP. Willing testified that he was having coffee with his wife and his brother-in-law, when a young man holding a black nylon bag walked up to their booth and said, "We're being robbed." Willing recalled that the young man was "obviously frightened" and was collecting money from all of the patrons in the restaurant. Willing only saw one of the four gunmen, "a tall, slender black man approaching the booth in which we were sitting," who kept both hands in his pockets. Although Willing presumed that the man was armed, he did not actually see him carrying a weapon. Willing stated that he put a few dollars into the black bag being passed around by the young white man.

After appellant's usual objection to the testimony was overruled, the prosecutor read to the jury the portion of appellant's statement pertaining to the IHOP incident. Appellant described the involvement of himself, James Allridge, Milton Ray Jarmon, and Clarence Jarmon. According to the statement, appellant wore a hat and sunglasses and carried a shotgun that evening. He described Milton as wearing a blue ski mask and carrying a .25 automatic

pistol, while Clarence wore a red ski mask and was armed with a .22 caliber revolver. Appellant's brother, James, was unarmed and carried "a black gym type bag." According to appellant James passed the bag around and collected the money from the customers. On the face of the statement it is also noted that all of the money was taken from the customers, and none from the establishment.

Finally, Jeanne Hassle, an employee at Quickway Shopping on Meadowbrook Drive, testified that she was robbed between 9:00 p.m. and 9:30 p.m. on March 15, 1985. She recalled that a man walked up to the counter with a single beer and requested a package of Marlboro Light 100's cigarettes. The man retrieved $2.00 from one pocket and pulled a gun with his other hand. Hassle placed the money in a sack, as requested, and then called the police after the intruder had left. On cross-examination Hassle stated that she could not make an identification for the police, although she recalled the man as being a black male, five eleven or six feet tall, and weighing 160 to 170 pounds.

Defense counsel again renewed his previous objection, noting: "I don't see the connection here at all." The objection was overruled and the State again read the relevant portion of appellant's statement. In his statement appellant described a robbery at the Quickway on Meadowbrook carried out by his brother, James. While James entered the store appellant circled the block and later picked James up on the street. James told the appellant that he had gotten $63.00 in cash, a bottle of Michelob beer and a pack of cigarettes.

Over appellant's objection the State was permitted to read the rest of State's Exhibit No. 34, which included references to appellant's involvement in five other aggravated robberies in the Fort Worth area.

██ It is the general rule that proof of extraneous transactions committed by a party is inadmissible except for certain specified exceptions. *Phillips v. State*, 659 S.W.2d 415, 418 (Tex.Cr.App.1983). The balancing test established by this Court in *Albrecht v. State*, 486 S.W.2d 97, 99 (Tex.

Cr.App.1972), requires that a determination be made as to whether the prejudicial effects of admitting this evidence are outweighed by the probative value this evidence may have in aiding the trier of fact in reaching a verdict. *Parks v. State*, 746 S.W.2d 738 (Tex.Cr.App.1987); see also *Moreno v. State*, 721 S.W.2d 295, 301 (Tex. Cr.App.1986); *Boutwell v. State*, 719 S.W. 2d 164, 172 (Tex.Cr.App.1985) (Opinion on Rehearing); *Garza v. State*, 715 S.W.2d 642, 644 (Tex.Cr.App.1986); *Robinson v. State*, 701 S.W.2d 895, 899 (Tex.Cr.App. 1985); *Williams v. State*, 662 S.W.2d 344, 346 (Tex.Cr.App.1983). It is also necessary that evidence of any extraneous transactions is shown to be relevant and that the accused actually participated in the extraneous offense. *Phillips*, supra, at 418; *Wallace v. State*, 679 S.W.2d 1, 5 (Tex.Cr. App.1983); *Cain v. State*, 642 S.W.2d 806, 808 (Tex.Cr.App.1982); *Elkins v. State*, 647 S.W.2d 663, 665, n. 3 (Tex.Cr.App.1983); *McCann v. State*, 606 S.W.2d 897, 900–01 (Tex.Cr.App.1980); see also 24 Tex.Jur.3d, Criminal Law, § 3035, p. 180. "Every case must be examined on its own facts, strengths and weaknesses to determine whether the extraneous transaction is relevant to a material issue, and whether the relevancy value outweighs the prejudicial potential." *Castillo v. State*, 739 S.W.2d 280, 289 (Tex.Cr.App.1987); see also *Collazo v. State*, 623 S.W.2d 647, 648 (Tex.Cr. App.1981).

Furthermore, Article 37.071(a), V.A.C. C.P., authorizes the trial court to admit *any* evidence which is relevant to the punishment, and the jury is authorized to consider this relevant evidence along with that adduced at the guilt-innocence stage of trial. *Briddle v. State*, 742 S.W.2d 379 (Tex. Cr.App.1987); see also *Earvin v. State*, 582 S.W.2d 794, 799 (Tex.Cr.App.1979). In *Smith v. State*, 676 S.W.2d 379, 390 (Tex. Cr.App.1984), this court noted inter alia:

"It has been consistently held that evidence of unadjudicated extraneous offenses are admissible at the penalty stage of a capital murder trial absent showing of unfair surprise. *Quinones v. State*, 592 S.W.2d 933 (Tex.Cr.App.1980),

*cert. den.* [449 U.S. 893] 101 S.Ct. 256 [66 L.Ed.2d 121]; *Crawford v. State,* 617 S.W.2d 925 (Tex.Cr.App.1980); *Rumbaugh v. State,* 629 S.W.2d 747 (Tex.Cr. App.1982). And such admission does not render the proceedings fundamentally unfair or deprive an accused of due process and equal protections of the laws. *Williams v. State,* 622 S.W.2d 116 (Tex. Cr.App.1981), *cert. den.* 455 U.S. 1008 [102 S.Ct. 1646, 71 L.Ed.2d 876]. See also *Garcia v. State,* 581 S.W.2d 168 (Tex.Cr.App.1979)." See also *Briddle,* supra, at 391.

The trial court at the penalty stage of a capital murder trial therefore has wide discretion in admitting or excluding evidence. *Briddle,* supra, at 391; *Smith,* supra, at 390.

■ In the instant case appellant signed a confession which implicated himself in thirteen extraneous armed robberies. The confession was properly introduced into evidence at the punishment stage of trial, and the State called several witnesses to verify the prior offenses related in appellant's confession. As noted by appellant, none of the disputed witnesses were able to identify or connect him to the extraneous offenses. However, in every instance the witness' testimony matched the details of each offense enumerated in appellant's confession. In *Carrillo v. State,* 591 S.W.2d 876, 892 (Tex.Cr.App. 1979), this Court held that a witness gave testimony that did "tend to connect" the defendant with the offense, and we noted: "This is not a case in which there was a total absence of evidence connecting the defendant to the extraneous offense." The testimony, combined with the statement offered into evidence, was sufficiently relevant and material to be admissible. The testimony also helped to connect appellant to the extraneous offenses described in his confession and provided valuable assistance to the jury in assessing punishment. Appellant's eight combined points of error are hereby overruled.

In his point of error number sixteen appellant complains the trial court erred in restricting his voir dire examination of prospective juror Charles Morrison.

On voir dire examination by the State, Morrison stated he had no religious or moral beliefs against the death penalty as a punishment for capital murder, and no bias or prejudice against a life sentence in such cases. He could keep an open mind as to punishment in a capital murder case, and would base his answers to the special issues submitted on the evidence and not answer "yes" or "no" in order to obtain the assessment of a particular punishment.

Morrison told appellant's counsel that the biblical injunction "an eye for an eye and a tooth for a tooth" was not always the proper punishment, and the biblical saying "turn the other cheek" would have application in some cases. When asked how he felt personally about the death penalty the record reflects:

"A  In some instances I think it's right, and in some instances I think it's not.

"Q  Okay. On a case by case basis I take it?

"A  Uh-huh.

\*      \*      \*      \*      \*      \*

"Do you have in your mind, as you sit here today, a set of circumstances where, in a capital murder case, a death penalty should be imposed, without telling me what it is?

"A  Okay. The only way I could say it.

"THE COURT: He stated without telling him what it is.

"PROSPECTIVE JUROR: Without telling him what it is?

"THE COURT: Right. The question was, do you have it in your mind. You see, neither side can bind you as to what type of case that you would feel the death penalty is appropriate and they can't bind you to what you'd do.

\*      \*      \*      \*      \*      \*

"Q  Without going into your thinking of what type of case it would be, my question is, is do you, as you sit here today, have an opinion in your mind as to what type of capital murder cases should always result in the death penalty?

"A   Yes, sir.

"Q   Okay. Now, my next question is—and I anticipate an objection on it just to tell you up front—is what of cases or facts are those—tell me what type of cases you think should always result in the death penalty.

"MS. WILSON: Your Honor, first we'd object.

"THE COURT: Sustained."

Telling counsel he knew what the ground rules were when he started the court postponed any argument on this ruling at that time. After the State accepted Morrison as a juror he was asked to step outside the courtroom and appellant's counsel presented his argument. The record reflects:

"... We're just trying to find out information as to how he thinks so that we can make use of proper peremptory challenges.

"THE COURT: Well, that would be getting into hypothetical and fact situations, which is not proper under Voir Dire.

"MR. CARTER: If I may respond to that, Your Honor, and be heard on that. I'm not asking him a hypothetical question or would he consider giving a death penalty in a certain hypothetical situation. I'm just asking them what his opinion is.

"THE COURT: The Court has ruled."

Thereafter the appellant exercised a peremptory challenge on the prospective juror.

The control of the voir dire examination rests within the sound discretion of the court. *Ussery v. State*, 651 S.W.2d 767 (Tex.Cr.App.1983). That discretion is not limitless and is reviewable for an abuse of discretion. *Ussery*, supra.

The decision of a trial court to restrict voir dire may only be reviewed to determine whether the restriction constituted an abuse of discretion. *Gardner v. State*, 730 S.W.2d 675, 689 (Tex.Cr.App. 1987); *Smith v. State*, 703 S.W.2d 641, 643 (Tex.Cr.App.1985); *Clark v. State*, 608 S.W.2d 667, 670 (Tex.Cr.App.1980); *Smith v. State*, 513 S.W.2d 823, 826–27 (Tex.Cr. App.1974). "The discretion is abused when

a proper question about a proper area of inquiry is prohibited." *Smith*, supra, at 827; *Campbell v. State*, 667 S.W.2d 221, 222 (Tex.App.—Dallas 1983, PDR granted). The test for reviewing a trial court's restriction of voir dire turns on whether the question is *proper:* "If the question is proper, an answer denied prevents intelligent use of the peremptory challenge and harm is shown." *Powell v. State*, 631 S.W. 2d 169, 170 (Tex.Cr.App.1982) [quoting *Mathis v. State*, 576 S.W.2d 835, 837 (Tex. Cr.App.1979)]; *Gardner*, supra, at 689; *Smith*, supra, at 643. Consequently, a defendant must show that the question he sought to ask was proper; a question is proper if it seeks to discover a juror's views on an issue applicable to the case. *Smith*, supra, at 643.

In *Hogue v. State*, 711 S.W.2d 9 (Tex.Cr. App.1986), cert. denied, 479 U.S. 922, 107 S.Ct. 329, 93 L.Ed.2d 301 (1986), defense counsel asked a prospective juror whether he felt the death penalty would be the only proper punishment for a defendant found guilty of capital murder. The trial court sustained the objection to such a binding question. This Court noted that the question was not pertinent to an inquiry concerning bias and prejudice against the applicable law. We held that "[t]he inability to articulate a set of facts where a life sentence was the proper punishment does not show an inability to consider the full range of punishment." *Hogue*, supra, at 27. This was especially true since the juror in *Hogue* clearly stated that he could consider both the death penalty and life imprisonment.

In the instant case the trial court did not restrict appellant's questioning as to how prospective juror Morrison felt about the death penalty or life imprisonment, but rather restricted the listing of hypothetical fact situations to illustrate his viewpoint. It has been written:

"A juror may not be asked on voir dire what he would or would not do at any particular stage of the proceeding under a given state of facts. He may, of course, be interrogated touching his views of the law and the application to

any fact situation that the evidence may present. Although allowing questions designed to ascertain the jurors views and sentiments on social and moral subjects generally, the courts do not permit a hypothetical case to be submitted; nor do they allow questions designed to bring out the juror's views on the case to be tried. To put into the inquiry a case, whether entirely hypothetical or the one to be presented by the questioner on the trial, is objectionable because the answer, whatever it may be, would not tend to show that the juror would not be impartial, and because the juror would thereby practically be pledged to a particular finding in advance of hearing the testimony."

23 Tex.Jur.3d, Criminal Law, § 2668, pp. 308–09; see also *Cuevas v. State,* 742 S.W. 2d 331, 336, n. 6 (Tex.Cr.App.1987) ("It is proper to use hypothetical fact situations to *explain* the application of the law. However, it is improper to inquire how a venireman would respond to particular circumstances as presented in an hypothetical question.") Here, appellant has made no showing that the question he sought to ask was proper. Even if it can be said that "Tell me what type of cases you think should always result in the death penalty?" is a proper question, it was "duplicitous" enough in light of the voir dire examination not to reflect an abuse of discretion on the part of the trial court. See *Smith v. State,* 513 S.W.2d 823 (Tex.Cr.App.1974). The point of error is overruled.

In his point of error number seventeen appellant complains the "trial court erred in restricting appellant's voir dire examination of prospective juror Tobar as to his ability to express himself in writing."

Fred Tobar, after explaining he didn't understand all of the jury instructions given the jury panel volunteered: "Well, here's the trouble with me. I don't know how to read or write too well, so I don't understand too much about this." He didn't fill out all his jury questionnaire "because I don't know how to write. That's what I'm trying to explain." Tobar stated he had no formal training in English and had only gone to the fourth grade. He

was then challenged for cause under Article 35.16(a)(11), V.A.C.C.P. Appellant's counsel then was permitted to inquire and was told by Tobar he filled out his name and address and ages of children but did not fill in other blanks on the jury questionnaire because "I can't hardly read too much. I mean I can't write." He was then asked to read the three special issues that could be submitted in a capital murder case. See Article 37.071, V.A.C.C.P. He mistook several words and stumbled through most of the sentences. He expressed a lack of understanding of several words. Appellant's counsel concluded: "So, you have trouble with some of the words, but you can read most of the words," to which Tobar replied: "Well, yes, I...." Tobar then told the trial court he didn't know the meaning of "deceased" and couldn't find the word "provocation" in the special issues after it was spelled for him. The trial court had Tobar read from a fourth grade reader which he managed with some difficulty, and stated he understood "some of that" but he could not write about what he had just read without copying from the book. The court then had Tobar read from a court's charge and then denied the State's challenge for cause. Upon further interrogation by State's counsel Tobar stated he did not know what "religious preference," "occupation," "sex of his first child" meant. He admitted he only listed three of his five children, that he really didn't know their ages. He didn't understand the question on the questionnaire about working in politics or in political campaigns. He didn't write the name of Southwestern Press as his former employer because he couldn't "write that down." When asked if he understood the question about the death penalty and capital murder, he responded: "I am trying to figure out what it's asking me."

▬▬ The State renewed its challenge and the court sustained the same. Appellant's counsel then stated: "A couple of things just for the record, that I wanted to ask him was, did he understand that that particular question just asked for him to make a checkmark. And the other thing I

would be interested in knowing is whether or not the reason he didn't fill out some of the questionnaire was simply because he didn't want to turn his paper in later than anyone else and it embarrassed him to admit in front of a large group of people that he couldn't fill out all the questions. And it might very well be that he was embarrassed, in that he turned it in incomplete when if he had the time that he needed, he could have answered some of those questions."

The juror was then permitted to step down and appellant's counsel was told the challenge had been sustained. An "exception" was taken to the court's action.

The conduct of the voir dire examination rests largely within the sound discretion of the trial court, and only an abuse of discretion will call for reversal on appeal.

In *Hernandez v. State*, 506 S.W.2d 884, 887 (Tex.Cr.App.1974), the veniremember had difficulty with the English language, but evidently could read and write English. The prospective juror in that case was challenged for his inability to read or write. We noted: "The requirement of ability to write is not satisfied by the ability of a proposed juror to write his name and nothing more. The requirement contemplates that he shall be able to express his ideas in writing." *Hernandez*, supra, at 887 [citing *Johnson v. State*, 21 Tex.App. 368, 17 S.W. 252 (1886)].

The *Hernandez* case was specifically upheld in *Brock v. State*, 556 S.W.2d 309, 313 (Tex.Cr.App.1977), cert. denied, 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977), in which the prospective juror testified that he got no "further than the first grade" and that he was unable to read or write the English language. The State's challenge for cause was sustained.

In *Garcia v. State*, 581 S.W.2d 168, 176 (Tex.Cr.App.1979), it was shown that the prospective juror had incorrectly filled out the juror information card and had misplaced and omitted certain information because he could not spell the names or words. The prospective juror explained

that he had trouble filling out the card and that he did not understand the questions. "Although he once stated that he thought that he could read and understand the court's charge, he stated that if the charge were as difficult as the juror information card, he would have difficulty in understanding it." *Garcia*, supra, at 176. Giving due deference to the trial court's sound discretion, we held there was no abuse of that discretion in sustaining the State's challenge to the prospective juror.

Unlike the court in *Goodman v. State*, 701 S.W.2d 850, 856 (Tex.Cr.App.1985), the trial court here did not excuse the juror sua sponte, but responded to the State's challenge for cause (after it had once denied the same) when the evidence became more convincing that Tobar was disqualified.

The court, under the circumstances, did not abuse its discretion in refusing to allow appellant's counsel to ask the additional questions sought about embarrassment, etc.

The point of error is overruled.

■ In point of error number eighteen appellant contends the court erred in overruling his challenge for cause of prospective juror Kelly Bird.

At one point Bird agreed he had a bias or prejudice against a life sentence in a capital murder case where the State had proved that an intentional murder occurred during the course of a robbery. A challenge for cause was made, but Bird was rehabilitated after further questioning by the State.[6] Later Bird agreed with counsel that he had a bias or prejudice against the minimum punishment of five years for the lesser included offense of murder. Bird was again rehabilitated by explanations and questions. He had no difficulty with the range of punishment for the lesser included offense of voluntary manslaughter. With regard to the lesser included offense of criminally negligent homicide Bird indicated that he had a bias or prejudice against the one dollar fine portion of the

6. See *Barefoot v. State*, 596 S.W.2d 875, 883 (Tex.Cr.App.1980), cert. den. 453 U.S. 913, 101 S.Ct. 3146, 69 L.Ed.2d 996 (1981); *Scott v. State*, 490 S.W.2d 578 (Tex.Cr.App.1973).

range of punishment. The record then reflects:

"MR. CARTER (Appellant's Counsel): Your Honor, we again renew our motion that he be struck for cause, in that he could not follow the minimum punishment range.

"THE COURT: Unless you can tell the Court that that would be in the charge here, you're overruled."

Appellant later exercised a peremptory challenge on Bird.

Assuming there was a valid challenge for cause and that the trial court erroneously overruled the same, in order for the appellant to show harm he must show (1) exhaustion of his peremptory challenges; (2) denial of a request for an additional peremptory challenge or challenges; and (3) the seating of a juror upon whom the appellant would have exercised a peremptory challenge. *Bell v. State*, 724 S.W.2d 780, 795 (Tex.Cr.App.1986); *East v. State*, 702 S.W.2d 606 (Tex.Cr.App.1985); *White v. State*, 629 S.W.2d 701 (Tex.Cr.App.1981), cert. den. 456 U.S. 938, 102 S.Ct. 1995, 72 L.Ed.2d 457; *Hernandez v. State*, 563 S.W.2d 947 (Tex.Cr.App.1978). See also *Barefoot v. State*, supra, at 881; *Moreno v. State*, 587 S.W.2d 405, 407–408 (Tex.Cr.App.1979).

The appellant did not exhaust his peremptory challenges or request additional peremptory challenges, nor was there a juror seated upon whom appellant would have exercised a peremptory challenge or whom he stated was objectionable. The point of error is overruled.

■ In his nineteenth point of error appellant contends the "trial court erred in restricting appellant's voir dire examination of prospective Juror Eugene Jones...."

Phillip Eugene Jones, a Baptist, was a homicide investigator for the Dallas Police Department who had studied law and who once desired to be an attorney. He was a frequent witness in both civil and criminal cases, having testified in 25 cases in the last six months. He could not recall any facts about the instant Tarrant County case.

Appellant's counsel expressed his concern to Jones at the outset of his interrogation of the juror that Jones was a police officer and worked homicide cases. Jones thereafter was interrogated about many matters. Jones told appellant's counsel he could conceive of a "no" vote on the first special issue, that he could conceive of a factual situation in a capital murder case where a life sentence would be appropriate, that he could consider mitigating evidence, and could consider defense counsel arguments against the death penalty, that while he believed in the death penalty he was "open minded about the facts." "If the facts are presented to me, I am going to deal with the facts of the case. I have always been like that, and there is no reason to believe that I could deal with each case individually."

Immediately thereafter appellant's counsel asked if Jones had in mind certain types of cases where the death penalty would be appropriate. Jones began to reply that if "you are dealing with a rape/murder case and it's a bad case—." The court sustained the State's objection to any recitation of facts which justify the prospective juror in his mind in giving or opposing the death penalty. Counsel then sought to ask Jones if he thought death was always appropriate in an intentional murder committed during the course of a rape. The court sustained the objection, pointing out Jones had said it depended on the facts. The record then reflects:

"MR. CARTER (Appellant's Counsel): I would like to further ask the witness, Your Honor, if he feels that the death penalty is always appropriate in a case where there has been an intentional murder during the course of a robbery or attempted commission of a robbery.

"MR. PIPES (Prosecutor): Your Honor, that is repititious (sic).

"THE COURT: Sustained.

"MR. CARTER: I'm not to be allowed to ask this witness that question, Your Honor? Is that the ruling of the Court?

"THE COURT: That is the ruling of the Court. I'll tell you what you can ask. You can ask him if he can consider death

and life, the full range of punishment in those type cases that you are asking about now, but you are trying to ask him if he has a preconceived idea that death is the only preferable penalty.

"MR. CARTER: Yes, sir. I am. That's what I would like to ask him.

"THE COURT: Well, it's sustained.

"MR. CARTER: We will pass the witness (sic), Your Honor."

Immediately thereafter the State accepted Jones as a juror and the appellant exercised a peremptory challenge upon the police officer. Without disputing the court's ruling that the question was repetitious or accepting the court's invitation to rephrase his questions the appellant terminated the voir dire examination. A trial court has wide discretion over the course of the voir dire examination of the jury panel, *Smith v. State*, 683 S.W.2d 393 (Tex.Cr.App.1984), and may impose reasonable restrictions, *Williams v. State*, 692 S.W.2d 671 (Tex.Cr.App.1984); *Ratliff v. State*, 690 S.W.2d 597 (Tex.Cr.App.1985). And not every restriction of questioning by a defendant at a voir dire examination of prospective jurors infringes upon constitutional rights. *De La Garza v. State*, 650 S.W.2d 870 (Tex.App.—San Antonio 1983, P.D.R. ref'd). Decision as to the propriety of a particular question on voir dire examination is left to the trial judge's discretion and only an abuse of such discretion will call for reversal on appeal. *Espinosa v. State*, 653 S.W.2d 446 (Tex.App.—San Antonio 1982), *affirmed* 669 S.W.2d 736 (Tex.Cr.App.1984). There is no error in prohibiting duplicitous questions where investigation into possibly proper or fruitful matters is not entirely prevented. *Smith v. State*, 513 S.W.2d 823, 827 (Tex.Cr.App.1974).

While the question may have been proper, given the previous interrogation and the court's offer to permit further interrogation as suggested, there was no abuse of discretion calling for reversal. The point of error is overruled.

In his twentieth point of error appellant urges the trial court improperly restricted the voir dire examination of Ginger Kimbrough.

During the voir dire examination of Kimbrough the record reflects the following upon examination by appellant's counsel:

"Q Do you feel like the death penalty is something that is absolutely necessary in our society?

"A At this time, yes.

"Q Okay. And do you feel like that prisons and a life sentence are something that are absolutely necessary in our society?

"A Yes.

"Q Do you feel like a life sentence is a deterrent to crime?

"A To some people it would be, yes.

"Q What do you feel about the biblical saying, an eye for an eye and a tooth for a tooth? What are your feelings about the statement?

"A I can't totally agree with it in all instances.

"Q You don't feel like it's always called for?

"A No.

"Q Where a person's life has been taken by another, do you feel like it's called for always in those answers?

"MS. Wilson (Prosecutor): We will object. It seeks to bind her to a specific answer.

"THE COURT: Sustained.

"MR. CARTER: I am attempting to ask her, Your Honor, is all instances she feels like that theory applies.

"THE COURT: I understand.

"MR. CARTER: I'll not be allowed to ask that question?

"THE COURT: No, sir, based on State's counsel's objection. You were trying to bind the juror. It's sustained."

As noted in the discussion of the previous point of error, a trial court may impose reasonable restrictions on the voir dire examination, and such authority rests within the sound discretion of the trial judge. *Marquez v. State*, 725 S.W.2d 217, 238 (Tex.Cr.App.1987); *Easterling v. State*, 710 S.W.2d 569, 578 (Tex.Cr.App.1986). The right of counsel to question the members of the jury panel in order to exercise

intelligently his peremptory challenges must be harmonized and balanced with the right of the trial judge to control the voir dire examination of the venire. *Ratliff v. State,* 690 S.W.2d 597, 599 (Tex.Cr.App. 1985); *Easterling,* supra at 587.

Earlier in the defense voir dire examination of Kimbrough she had stated that a life sentence was a deterrent to crime, that she was not prejudiced against a life sentence for capital murder, that in a proper case a life sentence is "the proper punishment" when the offense was capital murder/robbery, that she could honestly consider life as a proper punishment in a capital murder case, that she would consider mitigating evidence as well as defense counsel's agreements against the death penalty, that she could answer the special issues "no" in a proper case, knowing the result would be a life sentence, and that the burden was on the State at the penalty stage of the trial, etc. All of this occurred before the "eye for an eye" interrogation.

Repetitious or vexatious questioning on voir dire may be prevented. *Abron v. State,* 523 S.W.2d 405 (Tex.Cr.App.1975). As a trial court may impose reasonable restrictions on exercise of the voir dire, it may cut off duplicitous questioning, and if the prospective juror states his or her position clearly, unequivocally and without reservation, the court may properly refuse to permit further questioning. *Phillips v. State,* 701 S.W.2d 875 (Tex.Cr.App.1985), *cert. den.* 477 U.S. 909, 106 S.Ct. 3285, 91 L.Ed.2d 574. We find no abuse of discretion by the trial court. See *Marquez,* supra.

Further, the appellant accepted Kimbrough as a juror without any objection as to restriction on voir dire examination and requesting additional interrogation. The point of error is overruled.

Appellant's penultimate point of error contends the court erred in restricting his voir dire examination of prospective juror Karla Arndorfer.

■ Appellant on appeal appears to argue that the *restriction* denied him the intelligent use of his peremptory challenges, that the questions were proper, and the court abused its discretion. We find, as the State urges, that no objection was made on this basis or on the restriction of voir dire examination at the time. Nothing is presented for appellate review.

Appellant argues that the court would not permit him to ask Arndorfer if she would consider defense counsel's argument "against the death penalty" as well as defensive evidence "against the death penalty." Upon the State's objection to the first related question the court explained to Arndorfer the difference between jury arguments and evidence. Thereafter Arndorfer did answer that she would fairly weigh and consider defense arguments against the death penalty. The court sustained questions about whether the prospective juror would consider defense evidence "against the death penalty." It is clear that the court considered that counsel was inquiring about evidence relating to the effectiveness of the death penalty as a deterrent to crime. In *Granviel v. State,* 723 S.W.2d 141, 156 (Tex.Cr.App.1986), it was stated that "evidence about the effectiveness of the death penalty as an instrument of social policy is simply not relevant to the special issues of a capital punishment proceeding."

If there was any improper restriction on the voir dire examination of Arndorfer, we observe that it was the State that used a peremptory challenge on the prospective juror and exercised that challenge first in accordance with Article 35.13, V.A.C.C.P. Once the State exercised its statutory right first, and the prospective juror is excused, appellant is in no position to argue that any restrictive voir dire examination prevented him from making an intelligent use of his peremptory challenges.

Appellant's point of error is overruled.

■ In his twenty-second and last point of error appellant contends the "trial court erred in restricting appellant's voir dire examination of prospective juror Uzzell."

Apparently it is appellant's complaint that the trial court refused to permit him to further interrogate the prospective juror after the State's challenge for cause was sustained.

The prosecutor extensively interrogated Kathie Uzzell about her background. Then the prospective juror told the assistant district attorney that while she had checked the jury questionnaire "generally favored" with regard to the death penalty, she didn't feel that she could render it personally; that she didn't like and didn't want to be a juror in a case where she would be called upon to assess the death penalty; that it might color her feeling if she was placed in that position; that she had a personal principle against the death penalty; that she had a personal problem "with herself" and that if she had to do "that" she could not sleep at night.

Uzzell then told the court in response to its inquiry that she believed her personal views would substantially impair her duty as a juror.

Appellant's counsel was then permitted to inquire. Uzzell told him she didn't want to be in a position where she would have to render a decision as to the death penalty. During counsel's interrogation concerning the bifurcated trial, the prosecutor made the challenge for cause. The court permitted the interrogation to continue. Thereafter appellant's counsel inquired if Uzzell could set aside her personal feelings about the death penalty and answer the special issues based on the evidence and follow the law. An objection was interposed, and the court took over the interrogation, inquiring whether Uzzell's personal views would put her in a position whether she would not truthfully answer the questions, etc., or were such as to impair her in returning "a true verdict according to the law and evidence?" The record then reflects:

"PROSPECTIVE JUROR: In answer to his (Defense Counsel's) original question, no, I don't think that I could put my feelings aside, because I have been a total wreck over this since the day that I found out what kind of trial it was. And if I had to sit on a Jury, I would be in constant turmoil, knowing myself as I do, as to what I would be faced with having to choose. And I don't think that that would be fair to either side.

"THE COURT: The challenge is sustained.

"Thank you, Ma'am.

"MR. CARTER: Your Honor, I have some further questions that I would like to ask this lady.

"THE COURT: Well, Mr. Carter, I'm sorry. I have sustained the challenge.

"MR. CARTER: Note our exception, Your Honor."

Thereafter the prospective juror was excused. Appellant's counsel then asked the court to rule on a motion to sequester the jury, to post a "sign" of court instructions in the jury room, and inquired about a contempt hearing with regard to an unrelated prospective juror, etc. After these matters were discussed appellant's counsel asked to make "a bill" to show what questions he would have asked Uzzell in an attempt to rehabilitate her. He then stated the areas to which the questions would relate in an attempt to rehabilitate her. He wanted to determine if she understood the "two phase trial in Texas," if she could set aside her personal feelings and answer the special issues truthfully, if she felt like she could be a fair and impartial juror and understood she had a civic duty to serve, and to talk to her about a defendant being entitled to a fair cross-section of jurors drawn from the community, etc.

The court stated "a ruling has been made on this particular one and the Court was able to adequately listen to her entire Voir Dire and make the determination it did and that I could observe her demeanor and motion in the way she answered some of the questions and such. But I'll permit you to make a Bill at the proper time."

No such "bill" was later perfected.

Uzzell's testimony about her attitude toward the death penalty is very similar to that of the prospective juror Garcia in *Bell v. State*, 724 S.W.2d 780, 794 (Tex.Cr.App. 1986), who stated she did not believe in the death penalty and that she could not be a part of the process that assessed such punishment. Citing *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985), we held "that her opposition to the death penalty would substantially impair her performance as a juror." See also *Williams v. State*, 622 S.W.2d 116, 118 (Tex.Cr.App.1981), cert. den. 455 U.S. 1008,

102 S.Ct. 1646, 71 L.Ed.2d 876 (1982) (record adequately demonstrated that veniremembers' views about capital punishment would have prevented or substantially impaired the performance of their duties as jurors in accordance with instructions); *Ex parte Russell*, 720 S.W.2d 477, 484 (Tex.Cr.App.1986); *Carter v. State*, 717 S.W.2d 60, 74 (Tex.Cr.App.1986); *McCoy v. State*, 713 S.W.2d 940, 953 (Tex.Cr.App. 1986), cert. den. 480 U.S. 940, 107 S.Ct. 1590, 94 L.Ed.2d 779 (1987).

Great deference must be paid to the trial judge who sees and hears the prospective juror before making his ruling. Here the trial judge determined that Uzzell's personal views would prevent or substantially impair her performance as a juror, and stated to counsel his reason for doing so, citing Uzzell's demeanor and "motion" in the way she answered questions. The court even cited *Wainwright v. Witt*, supra, in his remarks to counsel.

It must be clearly remembered that appellant is not contending the court erred in sustaining the State's challenge for cause, but erred in restricting his voir dire examination in an attempt to rehabilitate Uzzell after the challenge was sustained. As noted earlier, the court has wide discretion in controlling the voir dire examination, *Marquez*, supra; *Easterling*, supra; *Ussery*, supra, and may cut off duplicitous interrogation, particularly where the prospective juror clearly and unequivocally states his position. See *Phillips*, supra. We find no abuse of discretion by the trial judge for limiting questioning, especially where the prospective juror was consistent in her views that the death penalty would impair her duties as a juror. See *Sawyers*, supra; *Vanderbilt v. State*, 629 S.W.2d 709 (Tex. Cr.App.1981).

The last point of error is overruled.

The judgment is affirmed.

CLINTON and TEAGUE, JJ., concur in the result.