

NUMBER 13-12-00106-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

**EDUARDO LEME DE OLIVEIRA,**                                     **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                             **Appellee.**

## On appeal from the 389th District Court
## of Hidalgo County, Texas.

# MEMORANDUM OPINION

### Before Justices Garza, Benavides and Perkes
### Memorandum Opinion by Justice Garza

Appellant, Eduardo Leme de Oliveira, was convicted of murder, a first-degree felony, and was sentenced to 25 years' imprisonment. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2011). On appeal, he argues that the trial court reversibly erred by (1) admitting evidence of his written statement to police; and (2) excluding, during the

sentencing phase, evidence of sentences received by his accomplices. We affirm.

## I. BACKGROUND

On October 12, 2008, Hidalgo County Sheriff's deputies discovered a dead body laying face down next to a car near an abandoned building in Mission, Texas. A cell phone and four ten-millimeter bullet casings were found next to the body. Police learned that the deceased matched a recently-filed missing person report, and they identified the deceased as Juan Antonio Morales.

Investigators contacted Morales's daughter, Vianca, who lived in an apartment with Morales, Morales's girlfriend Julissa Gonzalez, and Gonzalez's friend Enedelia Canales. Vianca reported that Morales had left Texas in July 2008 to work in Washington state. He came back to Texas in October 2008 but planned to return to Washington before long.

Vianca testified that she last saw her father when she went with him and other family members to see a movie. According to Vianca, Morales twice stepped outside during the movie to talk on his phone. When he returned to the theater, Morales told Vianca that a woman had called and told him that there was a man bothering Gonzalez. Morales gave Vianca a phone number and told Vianca to give the number to police if anything happened to him. Police later determined that the last calls made from the cell phone recovered at the scene of Morales's death were to that phone number, and the account associated with that phone number belonged to Gonzalez.

Gonzalez informed Investigator Francisco Mora that the phone was registered in her name but that it was being used, and paid for, by her friend Canales. Investigator Mora located Canales and confirmed that she was in possession of the phone. He also

2

determined that the calls displayed on Canales's phone matched those displayed on Morales's phone.

Gonzalez and Canales were subsequently arrested for Morales's murder. At trial, Gonzalez conceded that she began a sexual relationship with Canales while she was still dating Morales. When Morales went to work in Washington, Gonzalez and Canales spent "almost 24 hours" together every day. When Gonzalez told Canales that Morales was returning to Texas, Canales became "jealous" and "upset about the way he would treat [Gonzalez]." Gonzalez stated that both Morales and Canales were "very jealous" people and that Morales would hit her "on some occasions." Gonzalez testified that Canales once suggested that "something should happen" to Morales—"mean[ing] something like beat him up"—but that Canales did not plan to kill Morales. She admitted on cross-examination, however, that Canales did "make a comment" which Gonzalez "thought . . . referred to killing [Morales]." Specifically, Canales said: "I know a guy who knows how to teach [Morales] to respect women."

On October 11, 2008, Morales called Gonzalez at work and was "very upset" with her. Morales told Gonzalez that a woman had called him and told him that, while he was in Washington, Gonzalez cheated on him with another man. She later learned that it was Canales who had called Morales to tell him this. Later that evening, Gonzalez informed Canales about her conversation with Morales, and Canales told Gonzalez "not to worry, that [Morales] was never going to bother [Gonzalez] again." Gonzalez testified: "I asked her what she meant, and she said that he was already dead." According to Gonzalez, Canales also "told me that if the police asked me if I knew anything, that I was supposed to say that I didn't know anything."

3

Later that night, Gonzalez visited Canales at her mobile home because she was "very scared . . . [b]ecause of the police." She asked Canales what happened, and Canales said "[t]hat a guy shot [Morales] that night."

Canales testified that Gonzalez had told her that Morales once pointed a gun at her; it was at that point that Canales decided "that he needed to be gone . . . [t]o die." Canales claimed she was unable to kill Morales herself—"I can't. It's not right." She apparently had no similar moral qualms, however, about hiring someone else to do the job. Canales testified:

> I was at work. I was frustrated, having a bad day, and this guy, he asked me what was wrong with me. I tried to tell him nothing because we weren't really, like, best friends. . . . But he kept asking, and I finally told him what was wrong. . . . That someone that I loved was being abused. . . . And it was making me sad. . . . [The man] told me that if I wanted him to do it, he would kill him.

Canales identified Oliveira as the man who offered to kill Morales. She stated that she first thought Oliveira was joking and she ignored him, but Oliveira gave her his cell phone number. She thought about it for "[m]aybe a week or two." She talked to Gonzalez about it, and Gonzalez said "she didn't want me to get in trouble, that I didn't have to do it." Nevertheless, Canales decided that she would go ahead with the murder. She called Oliveira and arranged to meet at a restaurant. She showed Oliveira a picture of Morales and said "that was the guy." Oliveira did not ask for money or anything else in return.

When Canales got off of work on October 11, 2008, she called Oliveira and told him she "wanted him to do it." Oliveira instructed Canales to arrange a meeting with Morales and then pick Oliveira up. Canales called Morales using a phone that Gonzalez had given to her. Morales agreed to meet Canales at his apartment, and

4

Canales then picked up Oliveira, who brought a gun. When Canales and Oliveira arrived at Morales's apartment, there were people around, including kids, so they called it off. But Canales called Morales back, this time posing as the wife of a man who was having an affair with Gonzalez. She asked Morales to meet in front of an "old store" on Schuerbach Road. When they arrived, Canales was in the driver's seat of the car and Oliveira was hiding in the front passenger's seat. Morales then drove up and got out of his car. Canales thought Morales was holding a gun in his hand. When Morales approached Canales's car, Oliveira leaned over and shot Morales in the chest. When Canales began to drive away, Oliveira shot Morales "at least two" more times.

Canales was contacted by police and became concerned that she and Gonzalez would get in trouble. She decided to create an anonymous letter threatening Morales—using cut-up clippings from magazines and latex gloves to prevent fingerprints—and to leave it at Gonzalez's apartment in order to make it appear that Gonzalez was not involved in Morales's murder.

Investigator Mora testified that, after Canales was arrested, he searched Oliveira's ranch. He located a small empty box which had been used to store ten-millimeter ammunition. The box was not tested for fingerprints. No weapon or any projectiles or spent casings were found at the ranch at that time. Years later, however, in September 2011, a ten-millimeter Glock handgun was found on Oliveira's ranch. The gun was missing its barrel and was not operable. However, it matched the type and caliber of weapon used in Morales's murder.

Oliveira's then-girlfriend, Alejandra Garcia, testified that Oliveira once told her that he "wanted to have a relationship with two women." She took that to mean that he

5

wanted to have a sexual relationship with two women at the same time. She stated that she thought he was joking. After October 12, 2008, Oliveira spoke to Garcia on the phone and told her that she "shouldn't believe everything they say about me." Patricia Ramos and her husband Jesus Ramos, both friends of Oliveira, testified that Oliveira had once expressed interest in buying a weapon for self-protection at his ranch.

Canales pleaded guilty to, and was convicted of, Morales's murder. Gonzalez was convicted of manslaughter. On March 11, 2011, Oliveira was arrested in Monterrey, Mexico and was extradited to the United States. He gave a statement to Hidalgo County Sheriff's deputies on March 23, 2011. At trial, two documents were admitted into evidence over Oliveira's objections: (1) a Spanish-language form, initialed and signed by Oliveira, which set forth his statutory *Miranda* rights, *see* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (West 2005); *Miranda v. Arizona*, 384 U.S. 436 (1966); and (2) an English-language written statement, which also included a statement of Oliveira's *Miranda* rights and an express waiver thereof, in which Oliveira set forth his version of events.

In his statement, Oliveira claimed that Canales initially asked him if he would "kill for money." According to the statement, Oliveira was "shocked" by Canales's request and said no. About a month later, he met with Canales again, and she showed him a brown paper bag containing a gun and ammunition. Canales asked Oliveira to "accompany her," without specifying where, and he agreed. They drove to a "small little house" that was abandoned. Another car arrived shortly thereafter. A man stepped out of the other car and started walking towards Canales and Oliveira's vehicle. According to Oliveira's statement, when the man came close, Canales shot him several times.

6

Oliveira did not tell anyone about the shooting.

The jury, which had been instructed on the accomplice witness rule, *see* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005), and the law of parties, *see* TEX. PENAL CODE ANN. § 7.02(a) (West 2011), found Oliveira guilty of murder. At the sentencing phase, Oliveira sought to introduce evidence of the indictments and judgments in Gonzalez's and Canales's criminal cases. The State objected, and the trial court held a hearing outside the jury's presence, after which it sustained the objection and excluded the evidence. The jury assessed punishment at 25 years' imprisonment and a $5,000 fine. This appeal followed.

## II. DISCUSSION

### A. Admissibility of Written Statement

#### 1. Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review. *St. George v. State*, 237 S.W.3d 720, 725 (Tex. Crim. App. 2007) (citing *Ford v. State*, 158 S.W.3d 488, 493 (Tex. Crim. App. 2005)). We "afford almost total deference to a trial court's determination of the historical facts that the record supports especially when the trial court's fact findings are based on an evaluation of credibility and demeanor." *Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997). We "afford the same amount of deference to trial courts' rulings on 'application of law to fact questions,' also known as 'mixed questions of law and fact,' if the resolution of those ultimate questions turns on an evaluation of credibility and demeanor." *Id.* On the other hand, we conduct a de novo review of evidence when the resolution of mixed questions of law and fact do not turn on an evaluation of credibility

7

and demeanor. *St. George*, 237 S.W.3d at 725 (citing *Guzman*, 955 S.W.2d at 89).

We review the trial court's decision for an abuse of discretion. *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006). "We view the record in the light most favorable to the trial court's conclusion and reverse the judgment only if it is outside the zone of reasonable disagreement." *Id.* The trial court's ruling will be upheld if it "is reasonably supported by the record and is correct on any theory of law applicable to the case." *Id.* (citing *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990)).

### 2. Applicable Law

Article 38.22, section 2 of the code of criminal procedure provides that "[n]o written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement" that:

(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:

 (1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;

 (2) any statement he makes may be used as evidence against him in court;

 (3) he has the right to have a lawyer present to advise him prior to and during any questioning;

 (4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and

 (5) he has the right to terminate the interview at any time[1]; and

---

[1] With the exception of number five, these are the same warnings as required under *Miranda*. *See Miranda v. Arizona*, 384 U.S. 436, 444 (1966).

(b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section.

TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2. The accused must be administered the warnings specified above "or their fully effective equivalent" in order for the statement to be admissible. *Id.* § 3(e)(2).

### 3.    Analysis

During trial, a hearing was held on the admissibility of Oliveira's written statement to police. At the hearing, Leonor Garcia, then an investigator with the Hidalgo County Sheriff's Office, testified that she conducted a custodial interview of Oliveira in Spanish.[2] She stated that she advised Oliveira of his *Miranda*/article 38.22 rights, that Oliveira indicated his agreement to waive those rights, and that he then agreed to provide a statement. State's Exhibit 34, a form containing the statutory *Miranda* warnings in Spanish, was entered into evidence over Oliveira's objection. The form shows that Oliveira initialed each of the five enumerated warnings and signed the document. Garcia acknowledged on cross-examination, however, that this warning form did not contain an express waiver of rights. Rather, it merely advised Oliveira of his rights and asked if he understood them.

Oliveira proceeded to give an oral statement to Garcia, who then typed up Oliveira's words and prepared a written statement. The written statement set forth Oliveira's statutory *Miranda* rights, which he initialed, and it contained an express waiver

---

[2] Garcia stated that, although Oliveira is originally from Brazil and cannot read written Spanish, she read his rights aloud and he knew enough Spanish to understand her and to communicate with her. On cross-examination, Garcia agreed with Oliveira's counsel's suggestion that "he does not read Spanish, although he's fluent in the Spanish language."

9

of those rights.[3] The written statement was introduced into evidence over Oliveira's objection as State's Exhibit 35.

On appeal, Oliveira contends that: (1) the warning form did not satisfy article 38.22 because it did not contain an express waiver; and (2) the express waiver of rights contained in his written statement was ineffective because it was executed after Oliveira had given his oral statement. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(b) (stating that a written custodial statement must show on its face that the accused waived his rights "prior to and during the making of the statement").[4]

In response, the State argues that article 38.22 does not require an express statement from the accused that he waived his rights. *See Barefield v. State*, 784 S.W.2d 38, 40–41 (Tex. Crim. App. 1989), *overruled on other grounds by Zimmerman v. State*, 860 S.W.2d 89 (Tex. Crim. App. 1993). Indeed, the Texas Court of Criminal Appeals has held that a waiver need not assume a particular form and, in some cases, "can be clearly inferred from the actions and words of the person interrogated." *Joseph v. State*, 309 S.W.3d 20, 24–25 (Tex. Crim. App. 2010) (citing *North Carolina v. Butler*, 441 U.S. 369, 373 (1979); *Miranda*, 384 U.S. at 475). The State urges that an implied waiver may be established if it is shown that the accused was warned of his rights and

---

[3] The express waiver stated: "And prior to and during the making of this statement, I knowingly, intelligently and voluntarily waive those rights set forth in this document and have [sic] knowingly, intelligently, and voluntarily waived those rights, I do hereby make the following free and voluntary statement."

[4] As noted, Oliveira's written statement asserts that Canales planned and carried out the murder and that Oliveira was merely tangentially involved. Nevertheless, he asserts that he was harmed by the admission of the statement because, without it, there would be only "meager circumstantial evidence" to corroborate Canales's and Gonzalez's testimony. *See* TEX. CODE CRIM. PROC. ANN. art. 38.14 (West 2005) ("A conviction cannot be had upon the testimony of an accomplice unless corroborated by other evidence tending to connect the defendant with the offense committed; and the corroboration is not sufficient if it merely shows the commission of the offense."); TEX. R. APP. P. 44.2 (regarding harmless error in criminal cases). We need not determine whether Oliveira was harmed by the admission of his written statement, however, because of our conclusion herein that the trial court did not err in admitting the statement. *See* TEX. R. APP. P. 47.1.

understood the warnings, and yet proceeded to make a statement. *See Murphy v. State*, 100 S.W.3d 317, 322 (Tex. App.—San Antonio 2002, pet. ref'd) (holding that a waiver, though not explicit, was voluntary and knowing where there was "no evidence indicating [appellant's] will was overborne or his capacity for self-determination was significantly impaired because of coercive police conduct" or that appellant "exhibited any behavior which might suggest he did not understand his rights"). According to the State, the fact that Oliveira was warned of his statutory rights and understood them, and yet proceeded with the interview, implies that he waived those rights.

We decline to follow the State's reasoning. The cases cited by the State for the proposition that no express waiver is required involved the admissibility of recorded oral statements, not written statements. *See Barefield*, 784 S.W.2d at 40 ("video taped confessions"); *Joseph*, 309 S.W.3d at 22 ("DVD recording of [appellant's] interview").[5] Unlike written statements, which are governed by section 2 of article 38.22, recorded oral statements are governed by section 3 of that article. Crucially, section 2 requires that it be "shown on the face of the statement" that, among other things, "the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived" his rights; whereas section 3 requires only that "prior to the statement but during the recording the accused is given the warning . . . above and the accused

---

[5] *Murphy v. State* did involve the admissibility of a written statement. 100 S.W.3d 317, 319 (Tex. App.—San Antonio 2002, pet. ref'd). However, there was no dispute in that case as to whether the statement contained an express waiver as required by section 2 of article 38.22; the issue was whether that waiver was unconstitutionally coerced. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2 (West 2005); *Murphy*, 100 S.W.3d at 322 ("Murphy argues his waiver was compelled because he waived his rights only after authorities misled him to believe they had sufficient grounds to arrest him for murder."). The appellant in *Murphy* did argue in a separate point that his written statement failed to comply with article 38.22, but only on the grounds that the statement "does not reflect he received the warning provided in Article 15.17 of the Texas Code of Criminal Procedure." *Murphy*, 100 S.W.3d at 320–21. The court rejected that challenge, noting that "a defendant needs to be warned pursuant to Article 15.17 only if he receives his warnings from a magistrate," which was not the case there. *Id.* at 321 (citing TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2(a)). *Murphy*, therefore, says nothing about whether a written statement may be admissible in the absence of any express waiver at all.

11

knowingly, intelligently, and voluntarily waives any rights set out in the warning." TEX. CODE CRIM. PROC. ANN. art. 38.22, §§ 2, 3. That is, section 2 requires that a written statement be accompanied by an express waiver, but section 3 does not require that a oral statement be accompanied by an express waiver. The case law indicating that an express waiver is not required therefore applies only to oral statements. *Cf. Joseph*, 309 S.W.3d at 28 (Keller, P.J., concurring) ("We held in *Barefield* that Article 38.22 [section] 3 did not require an express waiver of rights."). Here, the challenged evidence was a written statement; accordingly, we apply the plain meaning of section 2 of article 38.22 and conclude that an express waiver appearing on the face of the statement is necessary for the statement to be admitted into evidence. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2.

Though we do not adopt the reasoning employed by the State, we find that Oliveira's written statement did contain an effective express waiver on its face, and so we agree with the State that the trial court did not abuse its discretion in admitting the statement. As noted, Oliveira's written statement, admitted as State's Exhibit 35, set forth the statutory *Miranda* warnings and contained an explicit statement that "prior to and during the making of this statement, I knowingly, intelligently, and voluntarily waive those rights set forth in this document . . . ." The warnings and the express waiver appear at the top of the document and Oliveira's typewritten narrative appears below. Oliveira argues that the express waiver was ineffective because he signed it only after he gave his initial oral statement. But the oral statement was not recorded and was not offered as evidence; only the written statement was. And it is undisputed that the written statement was preceded by an express waiver of rights as required by statute.

12

Moreover, the court of criminal appeals has held, in a case where the appellant contended that *Miranda* warnings should have been given before he began an unrecorded interrogation that led to a written statement, that "giving the required warnings before the accused signs the statement meets the statutory requirements" "because a written statement is not 'obtained' (because it is not admissible) until it is signed." *Dowthitt v. State*, 931 S.W.2d 244, 258–59 (Tex. Crim. App. 1996) (citing *Allridge v. State*, 762 S.W.2d 146, 157–58 (Tex. Crim. App. 1988)).

Oliveira's first issue is overruled.

## B.     Admissibility of Co-Defendants' Sentences

By his second issue, Oliveira contends that the trial court erred in excluding, at the sentencing phase, evidence of indictments issued and sentences imposed in the criminal cases of Gonzalez and Canales.

Texas Code of Criminal Procedure article 37.07, regarding evidence admissible at a trial's sentencing phase, states:

> Regardless of the plea and whether the punishment be assessed by the judge or the jury, evidence may be offered by the state and the defendant as to any matter the court deems relevant to sentencing, including but not limited to the prior criminal record of the defendant, his general reputation, his character, an opinion regarding his character, the circumstances of the offense for which he is being tried, and, notwithstanding Rules 404 and 405, Texas Rules of Evidence, any other evidence of an extraneous crime or bad act that is shown beyond a reasonable doubt by evidence to have been committed by the defendant or for which he could be held criminally responsible, regardless of whether he has previously been charged with or finally convicted of the crime or act.

TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1) (West 2006). We review a trial court's decision to admit or exclude evidence under an abuse of discretion standard. *Shuffield v. State*, 189 S.W.3d 782, 793 (Tex. Crim. App. 2006) (internal citations omitted). "If the

trial court's decision was within the bounds of reasonable disagreement, the appellate court should not disturb its ruling." *Id.*

Oliveira argues that the sentences received by Gonzalez and Canales for their participation in Morales's murder were relevant to Oliveira's sentencing because they represent part of "the circumstances of the offense for which he is being tried . . . ." *See* TEX. CODE CRIM. PROC. ANN. art. 37.07, § 3(a)(1)*.* We disagree. In *Joubert v. State*, the Texas Court of Criminal Appeals considered whether the trial court erred by excluding, at the punishment phase, evidence that the appellant's co-defendant received a thirty-year sentence as part of a plea bargain. 235 S.W.3d 729, 734 (Tex. Crim. App. 2007). The Court concluded that "[a] co-defendant's conviction and punishment have no bearing on a defendant's own personal moral culpability." *Id.* (citing *Morris v. State*, 940 S.W.2d 610, 613 (Tex. Crim. App. 1996) ("[E]vidence of a co-defendant's conviction and punishment is not included among the mitigating circumstances which a defendant has a right to present.")); *see Evans v. State*, 656 S.W.2d 65, 67 (Tex. Crim. App. 1983) ("We do not see how the conviction and punishment of a co-defendant could mitigate appellant's culpability in the crime. Each defendant should be judged by his own conduct and participation and by his own circumstances."). The Court stated that "such punishments 'relate[] neither to appellant's character, nor to his record, nor to the circumstances of the offense.'" *Joubert*, 235 S.W.3d at 735 (quoting *Morris*, 940 S.W.2d at 613). The fact that Gonzalez and Canales testified against Oliveira at trial does not alter this central holding. We conclude that the trial court's decision to exclude evidence of Gonzalez's and Canales's indictments and sentences was within the bounds of reasonable disagreement. *See Shuffield*, 189 S.W.3d at 793.

14

Oliveira's second issue is overruled.

### III. Conclusion

We affirm the judgment of the trial court.

DORI CONTRERAS GARZA,
Justice

Do not publish.
Tex. R. App. P. 47.2(b).

Delivered and filed the
21st day of February, 2013.